**WORLDTRAVELSERVICE, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 01–232C.

United States Court of Federal Claims.

May 21, 2001 *.

* OPINION ORIGINALLY FILED UNDER SEAL ON MAY 11, 2001

Paul M. Tschirhart, Washington, DC, for plaintiff. Heather M. Spring and Brian Hundertmark, of counsel.

Matthew P. Reed, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, and Director David M. Cohen, for defendant. Jonathan Baker, Department of Health and Human Services, of counsel.

## OPINION

FIRESTONE, Judge.

This post-award bid protest action comes before the court on the government's motion

for judgment on the administrative record and plaintiff's request for preliminary and permanent injunction. Plaintiff WorldTravelService ("WTS"), the incumbent contractor, challenges a contract awarded by the National Institutes of Health ("NIH" or "the agency") for travel services to Omega World Travel, Inc. ("Omega"). WTS seeks to enjoin NIH from performing this contract with Omega on the grounds that NIH failed to conduct proper discussions and failed to apply the proper evaluation factors during the procurement process.

Following the denial of its bid protest before the General Accounting Office ("GAO") on March 26, 2001, WTS filed the present action in this court on April 18, 2001. After discussion with the parties, the court decided to consolidate the plaintiff's motion for a preliminary and permanent injunction with final resolution of the case on the merits. Oral argument was heard on May 10, 2001.

## I. FACTS

### A. The Awards to WTS

The current controversy grows out of a protracted and contentious procurement process that began in July 1999. On July 6, 1999, NIH issued the first of three requests for proposals for travel management services.[1] The solicitation provided that the contract would be for five years, including one base year and four option years. NIH sent the solicitation to thirty-four firms, and six qualifying offers were submitted to the agency. After reviewing these six proposals, NIH awarded the contract to the incumbent, WTS, on November 10, 1999. Following the award to WTS, Omega filed a protest with the GAO challenging NIH's evaluation of its technical proposal and the price/technical tradeoff. While Omega's protest was still pending, NIH recognized that its best value analysis was largely undocumented. The agency therefore decided to take corrective action by reopening negotiations with all six offerors in the competitive range. The GAO dismissed Omega's protest as moot. *WorldTravelService*, 2001 WL 337822, at *2 (Comp. Gen. Mar. 26, 2001).

After reviewing the first round of proposals and developing questions for each of the six offerors, NIH requested that the offerors submit revised proposals to NIH by January 20, 2001. After its review of the second round of proposals, NIH again awarded the contract to WTS, and on May 2, 2000, Omega once again filed a protest with the GAO on the same grounds. In response to this second protest, NIH again agreed to take corrective action because, "the statement of work did not adequately reflect the needs of the agency and the evaluation factors did not reflect the importance of certain aspects of the work." *Id.* The GAO accordingly dismissed the second action as moot. *Id.*

In the meantime, given the delay caused by the wrangling over a new travel contract, NIH decided to extend WTS's previous contract to May 14, 2001. WTS has therefore continued to fulfill NIH's travel needs while these bid protest actions have been ongoing.

### B. The August 11, 2000 Amended Solicitation

On August 11, 2000, NIH revised the statement of work by adding a technical amendment to the request for proposals ("RFP"), requesting certain additional services and inviting new bids. According to Penny Koontz, NIH's contracting officer ("CO"), "This amendment more accurately expressed the needs of the NIH. More specifically, it required the contractor to have an off-site location in close proximity to the NIH shuttle bus system." Revised proposals were due by August 29, 2000. It is the award made pursuant this amended solicitation that WTS is now protesting before this court.

NIH sent the newly-amended solicitation to the six offerors in the competitive range on August 11, 2000. NIH described the services it now sought as follows:

This Statement of Work is for National Institutes of Health (NIH) travel management requirements. The objective is to provide high quality travel services to NIH employees and specifically authorized travelers. The Contractor will implement a

---

1. Solicitation No. 263–99–P(BH)–0032.

fee-based travel booking system with multiple methods for reservations including, but not limited to fax, E-mail, in-person, telephone and electronic self-booking system.

Part VI, Section M of the solicitation provided the "evaluation factors for award." In pertinent part, this section advised potential bidders that:

The major evaluation factors for this solicitation include technical (which encompasses experience and past performance factors) and cost/price factors. Although technical factors are paramount consideration [sic] in the award of the contract, cost/price is also important to the overall contract award decision. All evaluation factors other than cost or price, when combined, are significantly more important than cost or price.

Offerors are reminded that award will be made to that offeror whose proposal provides the combination of features that offers the best or greatest overall value to the Government. The Government is more concerned with obtaining performance capability superiority than lowest overall cost. *However*, the Government will not make an award at a significantly higher overall cost to the Government to achieve only slightly superior performance. Overall cost to the Government may become the ultimate determining factor for award of a contract as proposals become more equal based on the other factors.

Section M of the solicitation also provided the evaluation criteria that would be used by the Technical Evaluation Panel, or "TEP." Out of a possible 150 points, for example, a bidder could receive 100 points if it thoroughly understood the contract's requirements.[2] This 100–point "Understanding the Requirement" component, which is at the core of the scoring differences between the proposals at issue here, was comprised of several sub-

2. Section M provided the following evaluation categories and their respective possible point totals: Conformance to Minimum Requirements—Mandatory; Experience—Mandatory; Understanding the Requirement—100 points; Quality Control, Performance Standards and Management—30 points; Past Performance—10 points; and Other Services—10 points.

components, including: "Basic Understanding of Requirement"; "Service Configuration and Personnel"; "Patient Travel"; "VIP Service Methods"; "International Capabilities and Service Method"; "24 Hour Service Function"; "Back-up Support System"; "Technology and Management Reporting"; and "Implementation Plan." Each of these sub-components also had an assigned point total.

## C. Evaluation and Award to Omega

Three offerors responded to the August 11, 2000 revised solicitation by submitting revised bids by the due date of August 29, 2000. The TEP met on September 14, 2000, to review the proposals and rank them using the evaluation factors. After the TEP conducted its review of these revised bids, only WTS and Omega were deemed to be within the competitive range. WTS offered a five-year price of $4,092,950 and Omega offered a price of $2,121,000.

The technical evaluation provided by the TEP in September to choose the offer representing the best value to the government reported the following scores:

| Criteria | WTS | Omega | Points Available |
|---|---|---|---|
| Understanding the Requirement | 91.75 | 78.5 | 100 |
| Quality Control Procedures | 27 | 27.24 | 30 |
| Past Performance | 9 | 7 | 10 |
| Other Desired Services | 9.25 | 5.75 | 10 |
| Totals | 137 | 118.5 | 150 |

The majority of the 18.5–point difference between WTS and Omega, or 13.25 points, related to the "Understanding the Requirement" criterion.

Following the TEP's evaluation, NIH engaged in discussions with both parties.[3] With respect to Omega's offer, NIH identified five issues of concern:

3. The TEP did not conduct another round of scoring after receiving WTS's and Omega's final offers in October 2000, despite the fact that as a result of the intervening discussions both offerors made adjustments to their bids that may or may not have altered the scoring. The agency continued to rely on the TEP's September 21, 2000 report throughout the procurement process.

1. In your proposal, the square footage was not provided. If a commercial office is in existence, we are assuming it is leased/rented with adequate space to meet your current needs. If this is true, then we are requesting an answer as to how Omega proposed to fit 10 additional staff members at that location. Is the staff currently housed there going to be dedicated to the NIH, or would they continue to maintain the commercial business and the NIH account?

Also, you mentioned in your proposal that you could open an off-site location that was closer to NIH. Can you include a possible closer location and the cost in your FPR [Final Proposal Revision]?

2. If you were awarded the contract, how would you handle the SREA or meeting travel. I know this is not a part of the contract but the awardee will be requested to handle this travel.

3. There was no mention of interpreter services being available for on-site location (page 58).

4. There was no indication that special arrangements would be provided for physically disabled travelers.

5. For the electronic booking—Are you sure that you meant to put this at no cost?

The agency communicated these concerns to Omega during the discussion process. Omega responded to these concerns when it submitted its Final Proposal Revision ("FPR") to NIH on October 25, 2000. In particular, Omega stated in the cover letter accompanying its final proposal:

We would like to provide further clarification to portions of our Technical Proposal, which we outline below.... Our clarifications are as follows: ...

— Telephone Accessed Interpreters— We will provide NIH travelers with access to an expert team of interpreters and translators ....

— Services for Disabled Travelers—We propose a further technical enhancement to our program of ensuring that our employees treat patients at the Clinical Center with dignity, kindness, and respect ... [W]e will dispatch an agent to the patient's home or hospital room in any major metropolitan area to make the bookings required via wireless technology.

— Meet and Assist Services—In addition to the Airport meet and assist services we have proposed for NIH VIPs, we propose to provide such services for NIH patients and other travelers as required....

— Optional Dedicated Off-site Service Location—At the government's option, we will be able to provide off-site service from new office space at 8120 Woodmont Avenue, in the Woodmont Plaza ....

— Electronic Booking—We would like to reiterate that we will not charge a transaction fee for any booking completed online....

— Meeting Travel—... [W]e would like to reiterate that we are familiar with the needs of non-governmental travelers traveling using government funds....

Again, thank you very much for allowing Omega the opportunity to provide additional clarifications and enhancements ....

On the same day, Omega sent a second letter to further clarify the square footage of its proposed new office site, stating:

We have secured the option to lease the necessary additional space at our Rockville location on Montrose Road. This additional space represents approximately 1300 square feet, and is within the same building as our current retail location, yet is physically separated from our retail and commercial business operation. The additional space and proposed staff will be 100% dedicated to servicing the NIH account.

Omega's final bid price remained at $2,121,000.

With respect to WTS's proposal, the TEP's sole concern related to cost. Consistent with this concern, NIH advised WTS during the discussion period that, "You need to take a look at your prices, they are way too high." WTS responded to this concern in its final proposal:

*In reviewing the fee structure, please note that the charges for the delivery services*

*have been dramatically reduced from our past offers.* This significant reduction has been made possible by the close proximity of our full service off-site location to the NIH offices, our ability to negotiate lower costs with our suppliers, and the two-tier fee structure noted in the Offer section of this Final Proposal Revision.[4]

Significantly, in its final proposal WTS reduced its price by $1,004,900, moving its offer from $4,092,950 to $3,088,050.

Following receipt of the final offers, the CO determined that it was in the best interest of the government to award the contract to Omega. In the Second Revised Source Selection Memorandum, the CO stated: "In their FPR, Omega adequately addressed the concerns/questions from the TEP and thus established that, in fact, they do fully understand our requirement," and "Omega's proposal clearly illustrated a comprehension and appreciation of our requirements as shown by their proposed staffing levels and training, 24 hour a day/365 days a year immediate access, discussion of NIH peak travel periods, extensive patient related travel (St. Jude's), telephone accessible interpreters (143 languages with 24 hour a day access), existing off-site centralized facility, multiple CRS, Mega systems, management reports and a dedicated web site for travelers."

While recognizing that WTS's overall technical rating was 18.5 points above Omega's, the CO noted that, "The greatest difference in associated points was related to whether Omega fully understood the stated requirements." Because she determined that Omega had addressed the TEP's concerns in its final proposal by answering all of the TEP's questions, the CO concluded that Omega had established that it "fully understood the requirements and [is] technically proficient." In these circumstances, neither she, the TEP, nor the project officer could "justify that the technical abilities of WTS are so superior to [Omega's] that it warrants the exorbitant difference in proposed costs." The Second Revised Source Selection Memorandum also contained a specific price analysis which stated:

> The TEP and the Contracting Officer are confident that [Omega] can perform the requirements of the contract with the prices they have proposed. Both companies offered the three other desired services that NIH requested in Amendment No. 5 at no additional cost to the Government. They were the Frequent Traveler Program, Shuttle Service to Dulles International Airport and Outside Meeting Planning. Also, both companies offered a listing of other value added services. *While WTS offered more of these services, those from [Omega] will more than satisfy the needs of the NIH.* The additional services from WTS does not [sic] warrant the payment of the exorbitant difference in the prices over the five year contract period.
>
> . . .
>
> Based on the above, it has been determined that the proposal from [Omega] provides the best overall value to the Government for providing Travel Management Services to the NIH. The prices are being accepted and are determined to be fair and reasonable.

(Emphasis added.) On December 21, 2000, NIH awarded the contract to Omega.[5]

### D. WTS's Protest Before the Government Accounting Office

On January 8, 2001, WTS filed a protest with the GAO challenging NIH's award of the contract to Omega. Because the timely-filed GAO protest automatically stayed the award to Omega pending resolution of the matter, NIH exercised a three-month option on the incumbent contract held by WTS. That option period ends on May 14, 2001, at

---

4. The Second Revised Source Selection Memorandum for RFP # 263–99–P(BH)–0032 shows that WTS reduced its unit prices for all types of ticket transactions in its FPR. In its prior offer, WTS had offered unit prices as follows for the base year of the contract: electronic booking for $14.00 per unit; E-mail/fax booking for $15.50 per unit; and phone/in person booking for $19.90 per unit. In its FPR, WTS offered in-stead: electronic booking for $10.00 per unit; E-mail/fax booking for $12.00 per unit; and phone/in person booking for $14.00 per unit. WTS also offered free delivery of all tickets under its final offer.

5. Contract No. 263–01–D–0121.

which time Omega is scheduled to commence performance.

After briefing, the GAO denied WTS's protest on March 26, 2001. *See WorldTravel-Service,* 2001 WL 337822 (Comp.Gen. Mar. 26, 2001). With regard to the matters presently before this court, the GAO held that the agency's "best value" evaluation was not unreasonable and that the discussions between NIH and both parties were meaningful and proper.

WTS's first challenge before the GAO was that NIH's price evaluation was flawed because it "failed to recognize that Omega's low price demonstrated a lack of understanding of the RFP's requirements." *Id.* at *3. The GAO held that the argument was without merit, because, "Where, as here, an RFP contemplates the award of a fixed-price contract, the agency is not required to conduct a realism analysis; this is because a fixed-price (as opposed to a cost-type) contract places the risk and responsibility for loss on the contractor." *Id.* The GAO also observed that NIH had indeed "actually compared all offerors' prices with one another in spreadsheet form, and specifically concluded from this comparison that Omega understood the requirement." *Id.*

WTS next challenged NIH's technical evaluation of Omega's offer, arguing that "several aspects of Omega's technical proposal failed to meet the RFP's requirements," calling into question the propriety of the price evaluation. *Id.* The GAO reviewed each of WTS's specific allegations regarding Omega's alleged shortfalls, and found that none had merit. For example:

> With regard to VIP services and the offsite office, WTS observed that Omega had not proposed the same level of staffing as WTS, which based its proposal on the levels maintained under the incumbent contract. However, as noted above and by the agency, this was a performance-based contract—rather than establish minimum requirements for staffing, the RFP left it to offerors to determine the best means of meeting the requirements. NIH therefore evaluated Omega's proposal on its own merits, and concluded that Omega's proposed staffing was sufficient for the re-

quired services. WTS has identified nothing in Omega's proposal or elsewhere in the record that would lead us to question this conclusion.

*Id.*

WTS next asserted that the discussions with the parties were "unequal, and thus improper, because the agency specifically advised Omega of deficiencies in its proposal, but did not do the same for WTS." *Id.* Again, the GAO found the challenge without merit: "We find nothing improper in the discussions here. While Omega's discussions contained a number of technical questions, and WTS's did not, the absence of similar questions for WTS is attributable to the fact that the agency did not find any technical deficiencies in WTS's proposal which required correction through discussions." *Id.* at *4.

The last argument made by WTS pertinent to the present action was that NIH's tradeoff between price and technical factors was flawed:

> WTS calculate[d] (using its own mathematical formula) that, in making its award determination, NIH weighted technical factors at only 69.9 percent and price at 30.1 percent. In WTS's view, this weighting was inconsistent with the RFP's statement that the technical factors would be "significantly" more important than price. WTS believe[d] its technical proposal was clearly superior to Omega's, and that a proper weighting of the technical and price factors would have resulted in selection of its proposal for award.

*Id.* at *6. The GAO found that NIH's tradeoff had been reasonable, holding that, "Notwithstanding a solicitation's emphasis on technical merit, an agency properly may select a lower-priced, lower technically rated proposal if it decides that the cost premium involved in selecting a higher-rated, higher-priced proposal is not justified, given the acceptable level of technical competence available at the lower price." *Id.* (citing *Tidewater Homes Realty, Inc.,* Comp. Gen. B–274689.5, Aug. 11, 1998, 98–2 CPD ¶ 40, at 4, 1998 WL 469705).

### E. This Litigation

On April 11, 2001, WTS filed a pre-filing notice of intent with this court, announcing its intent to challenge the award to Omega, and thereafter filed its complaint on April 18, 2001. In its motions for preliminary and permanent injunction and in opposition to the government's motion on the merits, **WTS argues** the following: 1) NIH failed to conduct equal and meaningful discussions with WTS; 2) NIH misapplied the evaluation criteria and thus its decision is arbitrary, capricious and not in accordance with law; and 3) WTS is entitled to a preliminary and permanent injunction.

## II. DISCUSSION

### A. Scope and Standard of Review

■ Pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (1994 & Supp. IV 1998), review of post-award bid protest actions is based on the administrative record developed before the relevant contracting agency. *See Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997). Under its jurisdictional statute, this court is required to apply the standard of review prescribed in the Administrative Procedures Act, which authorizes a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 341; 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A) (1994). *See also Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998); *Miller–Holzwarth, Inc. v. United States*, 42 Fed.Cl. 643, 649 (1999).

■ Under the standard set forth above, the aggrieved bidder has the burden to demonstrate that there is no rational basis for the agency's decision. *Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 247 (1997), *aff'd*, 155 F.3d 566 (Fed.Cir.1998) (table). In addition, to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it. *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

Finally, a bid protest action is ordinarily considered on cross motions for judgment on the administrative record. A motion for judgment on the record is treated as a motion for summary judgment under Federal Rule of Civil Procedure 56(a). *See* Rules of the Court of Federal Claims Rule 56.1(a); *Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed.Cir. 1997) (table). It is against this backdrop that the court will review the parties' motions for judgment on the administrative record.

### B. NIH Conducted Meaningful Discussions with Both Offerors

WTS contends that the award to Omega should be set aside on the grounds that NIH failed to conduct meaningful discussions with WTS and unfairly aided Omega in obtaining the award. The government counters that NIH conducted proper discussions with both offerors. For the reasons set forth below, the court agrees with the government.

§ 15.306 of the Federal Acquisition Regulation ("FAR") establishes the parameters for dealing with offerors after receipt of proposals, but before source selection:

(2) The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.

(3) The contracting officer *shall* ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. *The scope and extent of discussions are a matter of contracting officer judgment.* In discussing other aspects of the proposal, the Government *may* ... suggest to offerors that have exceeded any mandatory minimums (in ways that are not integral to the design), that their proposals would be more competitive if the excesses were removed and the offered price decreased.

FAR § 15.306 (emphasis added). In this connection, "significant weakness" is defined as, "a flaw [in the proposal] that appreciably increases the risk of unsuccessful contract performance," FAR § 15.301, and "deficiency" is defined as, "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level," *id.*

 "Case law provides that discussions are meaningful if they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999) (internal quotations and citations omitted), *aff'd,* 216 F.3d 1054 (Fed.Cir. 2000). In accordance with the discretion provided under the FAR, however, "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *Development Alternatives, Inc.,* Comp. Gen. B–279920, Aug. 6, 1998, 98–2 CPD ¶ 54, at 7, 1998 WL 546017 (citing *SeaSpace Corp.,* Comp. Gen. B–252476.2, June 14, 1993, 93–1 CPD ¶ 462, at 15, 1993 WL 225968). Rather, the agency should tailor its discussions to each offer, since the need for clarifications or revisions will vary with the proposals. *See CHP Int'l, Inc.,* Comp. Gen. B–266053.2, Apr. 29, 1996, 96–2 CPD ¶ 142, at 7, 1996 WL 582421 (citing *The Pragma Corp.,* Comp. Gen. B–255236, *et. al.,* Feb. 18, 1994, 94–1 CPD ¶ 124, at 9, 1994 WL 57386); 48 C.F.R. § 15.306(d)(1). Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer. *See Labat–Anderson v. United States,* 42 Fed.Cl. 806, 834 (1999) (citations omitted); *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 450, 471 (1999).

 Tested by these standards, it is clear that NIH conducted meaningful and fair discussions with both parties. First, the administrative record demonstrates that NIH conducted adequate discussions with WTS. The record reveals that the agency's only concern with WTS's proposal was that its price was too high. Accordingly, NIH was obligated to inform WTS of this concern over price. WTS does not dispute that NIH informed it that its price was too high. Indeed, NIH expressly advised WTS during discussions: "You need to take a look at your prices, they are *way too high.*" (Emphasis added.) As explained by the CO in her statement for the GAO protest, "There were no technical questions that would have enhanced [WTS's] proposal, however, they were asked to take a look at their prices because they were considered to be too high." Moreover, WTS does not dispute that following delivery of this comment from the CO, WTS dropped its offer price by $1,004,900, thereby reducing its original bid price by 24.6%. In conveying its FPR, WTS wrote:

> *please note that the charges for the delivery services have been dramatically reduced from our past offers.* This significant reduction has been made possible by the close proximity of our full service off-site location to the NIH offices, our ability to negotiate lower costs with our suppliers, and the two-tier fee structure . . . .

In these circumstances, while WTS may believe that it should have been given better guidance, it certainly cannot claim that it did not understand the need to reduce its price. The comment plainly led WTS "into the areas of [its] proposal ... requiring amplification or correction." *SDS Int'l v. United States,* 48 Fed.Cl. 759, 773 (2001).

 Moreover, WTS's contention that NIH was obligated under the FAR to give it more specific instructions regarding price cuts it could have made to compete more effectively against Omega is not supported. Agencies are not obligated to provide the type of specific guidance WTS claims is required by the FAR. In *LaBarge Electronics,* Comp. Gen. B–266210, Feb. 9, 1996, 96–1 CPD ¶ 58, 1996 WL 53930, the GAO explained that the government is not obligated to advise an offeror where its prices could be reduced. "[W]hile agencies generally are required to conduct meaningful discussions by leading the offerors into the areas of their proposals requiring amplification, this does

not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal." *Id.* at 6. *See also SDS Int'l,* 48 Fed.Cl. at 774 (the government is not required to "recommend a particular level of staffing," where the agency's discussions related to staffing and where the final offer responded to discussions). Where, as here, the agency's admonition led WTS to make a significant price adjustment in its final bid proposal, the court cannot say that NIH violated its procurement obligations.

 Second, the record demonstrates that NIH's discussions with Omega were not so detailed as to be "unfair" or "unequal" when compared to those with WTS. The court agrees with the GAO's conclusion in this matter that, "While offerors must be given an equal opportunity to revise their proposals, and the FAR prohibits favoring one offeror over another, discussions need not be identical; rather, *discussions are to be tailored to each offeror's proposal.*" *World-TravelService,* 2001 WL 337822 at *4 (citing *Northrop Grumman Corp.; ITT Gilfillan,* Comp. Gen. B–274204, et al., Nov. 27, 1996, 96–2 CPD ¶ 232, at 10) (emphasis added). While GAO decisions are not binding on this court, generally the recommendations of the GAO are accorded deference. *See E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123, 134–44 (1995). Here, that deference is justified.

 The record shows that NIH identified five items for discussion with Omega, three of which were simply requests for clarification. The two items listed as weaknesses—interpreter services and accommodations for the physically disabled—were both expressly required under the RFP but not adequately addressed in Omega's preliminary offer. For this reason, NIH's discussion of Omega's weaknesses constituted precisely the discussions dictated by the FAR:

The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms

and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.

FAR § 15.306(d)(3). The fact that NIH additionally sought clarification on some of the points of Omega's offer—details about its proposed work site, its intention to provide free electronic ticketing services, and meeting travel—does not mean that the negotiations were biased in favor of Omega. In respect to both WTS and Omega, NIH identified the weaknesses each had to address to make its bids more responsive. That is all that is required.

## C. NIH's Decision Was Neither Irrational nor Contrary to Law

At the heart of WTS's protest is its claim that NIH failed to properly support its conclusion that Omega presents the "best value" to the government in compliance with the terms of the solicitation. In particular, WTS charges that NIH failed to adequately explain how Omega's technical score, which was 15.6% lower than WTS's technical score, became "more equal" with WTS's so as to justify the award. The government explains that NIH fulfilled this obligation when it examined the services of both offers in the Second Revised Source Selection Memorandum, and specifically compared the relative merits of each proposal in the "Price Analysis" section.

The record demonstrates that in its Second Revised Source Selection Memorandum, NIH concluded: "In their FPR, Omega adequately addressed the concerns/questions from the TEP and thus established that in fact they do fully understand our requirement." NIH then stated:

The technical proposal from WTS received an initial overall rating that was 18.5 points higher than Omega. The greatest difference in associated points was related to whether Omega fully understood the stated requirements. In their FPR, Omega adequately addressed the concerns/questions from the TEP and thus established that in fact they do understand our requirement. However, there still exists a significant disparity in the proposed costs.

WTS's final proposed prices are approximately $967,000 higher over the five year period of performance. The TEP, the Project Officer or [sic] the Contracting Officer, can not justify that the technical abilities of WTS are so superior to [Omega] that it warrants the exorbitant difference in proposed costs.... Omega's proposal clearly illustrated a comprehension and appreciation of [NIH's] requirements as shown by their proposed staffing levels and training, 24 hour a day/365 days a year immediate access, discussion of NIH peak travel periods, extensive patient related travel (St. Jude's), telephone accessible interpreters (143 languages with 24 hour a day access), existing off-site centralized facility, multiple CRS, Mega systems, management reports, and a dedicated web site for travelers.... In conclusion, [Omega] offers the best overall value for the Government. While their technical score is 18.5 [points] lower than WTS, the exorbitant difference in proposed cost of $967,000 over the five year period of performance can not be justified. Therefore, based on all evaluation factors, it is in the best interest of the Government to award a contract to [Omega] for the Travel Management Services at NIH.

In view of the foregoing, the court finds that WTS's contention that NIH failed to adequately support its decision is without merit. WTS's claim that NIH had to expressly state that the offers were "more equal" elevates form over substance. The record plainly demonstrates that NIH fully considered Omega's technical capabilities and only awarded the contract to Omega after concluding not only that Omega fully understood the contract requirements but that Omega would "more than satisfy the needs of the NIH." The court cannot say, therefore, that NIH failed to find that Omega's proposal became "more equal." NIH's description of Omega's offer clearly indicates that NIH reached that conclusion.

 It is well settled that "[t]echnical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess." *Hydro Eng'g, Inc. v.*

*United States,* 37 Fed.Cl. 448, 467 (1997) (citing *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996)). Therefore, this court's main task is to ensure that the CO examined the relevant data and articulated a "rational connection between the facts found and the choice made." *See, e.g. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). NIH has done that here. NIH looked at Omega's FPR and concluded that Omega's weaknesses had been adequately addressed, assessed the relative merits of each proposal in the Price Analysis section of the source selection memorandum, and concluded, consistent with the solicitation, that WTS's price did not justify an award. "While [Omega's] technical score is 18.5 [points] lower than WTS, the exorbitant difference in proposed cost of $967,000 over the five year period of performance can not be justified."

There are numerous examples of situations, much like the one here, where an agency's decision to award a contract to a lower-cost offeror was justified despite a modest disparity in technical ratings. For example, in *Property Analysts, Inc. v. United States,* 1998 WL 395151 (D.D.C.1998), the district court rejected a claim similar to that raised by WTS. In that case, while plaintiff acknowledged that the awardee's price was approximately 23% lower, plaintiff asserted that because the RFP stated that cost was to be the least important factor in the agency's evaluation, plaintiff's 19–point technical advantage (out of a possible 100 points) over the awardee should have trumped the awardee's 23% lower cost. However there, like here, the RFP provided both that the technical evaluation factors would be more significant than cost in selecting a contractor, and that the contract would be awarded to the offeror whose proposal was most advantageous to the government, and that price could be the determining factor if two or more offers were considered "technically equivalent." *Id.* at *1. Because the agency had found the defendant awardee to be technically capable to fulfill the contract require-

ments, the district court concluded: "The contracting officer rationally concluded that the contract should be awarded to [the defendant] based on its lower bid price, as well as defendant's technical qualifications, demonstrated abilities and experience in performing field review of appraisals." *Id.* at *4.

Similarly, in *ITT Federal Services Corp. v. United States*, 45 Fed.Cl. 174 (1999), the court held that a modest difference in technical ratings need not undermine an agency's decision to consider cost in its final award decision:

> Plaintiff has further argued that the [government] erred in awarding the contract to Northrop because the proposals had to be technically equivalent before price became determinative. However, the language of the solicitation does not require strict technical equivalence before price may properly be considered. Rather, it establishes a continuum from which the best value to the government may be selected, stating: The greater the equality of the proposals, the more important price and other price factors become in selecting the best value.

*ITT*, 45 Fed.Cl. at 193.

In addition, the GAO has also found on several occasions that where there is a modest technical difference between bidders, an agency may consider price in making a final determination even where the solicitation provides that cost is the least important evaluation factor, just as the NIH solicitation at issue here did. The GAO has consistently held that point scores are useful guides, but do not mandate the selection of any particular proposal in such circumstances:

> Whether a given point spread between two competing proposals indicates a significant superiority of one proposal over another depends upon the facts and circumstances of each procurement and is primarily a matter within the discretion of the procuring agency. The question of whether a difference in point scores is significant is for determination on the basis of what that difference might mean in terms of the

contract performance and what it would cost the government to take advantage of it.

*Schaeffer Eye Ctr.*, Comp. Gen. B–284268, Mar. 20, 2000, 00–1 CPD ¶ 53, at 4, 2000 WL 306685.

 And finally, in *M–Cubed Information Systems, Inc.*, Comp. Gen. B–284445, 284445.2, Apr. 19, 2000, 00–1 CPD ¶ 74, 2000 WL 656188, also a case in which an offeror with a lower technical score than the protester was given the award, the GAO observed that: "an agency may properly award to a lower rated, lower cost offeror, even if cost is the least important evaluation factor, if it reasonably determines that award to the higher cost offeror is not justified given the level of technical competence available at the lower cost." *Id.* at 8.

 The present case is very similar to the above-noted cases. NIH has concluded that Omega's offer provide the agency with travel services that nearly equaled WTS's, but at a significant cost savings.[6] The court cannot say on this record that NIH was irrational when it concluded, once Omega alleviated NIH's technical concerns, that WTS's added services did not justify paying an additional 46% in costs. Under the arbitrary and capricious standard, this court must uphold a procurement decision so long as it has a rational basis. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. The court finds that NIH satisfied this standard.

In view of the foregoing, WTS's reliance on cases where the technical ratings were significantly different, or where the final "best value" decision was not adequately explained, is misplaced. Those cases can be distinguished from the present case. In *Latecoere International, Inc. v. United States*, 19 F.3d 1342 (11th Cir.1994), the court held that an award to an offeror other than an exceptionally-rated offeror was improper based on evidence of bias and manipulation in the procurement process. *Id.* at 1350 n. 6. Here,

---

**6.** WTS suggests that in evaluating cost, the court must also consider the contract termination costs the agency will face when it ends its relationship with WTS. The court is not aware of, and WTS has not identified, any support for this position. Indeed, as the government argues, consideration of such factors would not be appropriate.

there is no evidence of bias or duplicity in the procurement process. In *MCR Federal, Inc.*, Comp. Gen. B–280969, Dec. 14, 1998, 99–1 CPD ¶ 8, 1998 WL 953965, the government improperly selected an offeror with a lower technical rating where the record of the "best value" procurement process proved to be devoid of contemporaneous documentation of the evaluation process and the resulting rankings of the bidders, or in the alternative, an explanation of why the award to the higher-rated proposal was not worth the cost premium. *Id.* at 7. In the present case, the record is replete with explanations of Omega's own technical capabilities and justification for the TEP's recommendation. And, in *PharmChem Laboratories, Inc.*, Comp. Gen. B–244385, Oct. 8, 1991, 91–2 CPD ¶ 317, 1991 WL 216281, the government was found to have improperly departed from the stated bid evaluation criteria by discounting the apparent technical advantage of one offeror in favor of the relatively small price advantage presented by another—specifically, a difference of approximately $82,500, or 1.6% of the proposal price—without explanation. *Id.* at 5–6. Here, the court is faced with a 46% price disparity, far greater than *PharmChem*'s 1.6%.

In sum, NIH both considered and supported its "best value" determination. The court cannot say that the decision was irrational. As such, the decision of the contracting officer must be upheld.

## III. CONCLUSION

Based on the foregoing, the court concludes that NIH's procurement decision was not arbitrary, capricious, or otherwise contrary to law. Accordingly, WTS's motion for preliminary and permanent injunction is **DENIED** and judgment for the United States on the administrative record is **GRANTED.** Each party shall bear its own costs.