723

STANDARD COMMUNICATIONS,
INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

CACI–ISS, Inc., and HP Enterprise Ser-
vices, LLC, and Science Applications In-
ternational Corporation, Defendant–In-
tervenors.

No. 11–530 C.

United States Court of Federal Claims.

Filed Under Seal: Nov. 9, 2011.

Reissued for Publication: Nov. 22, 2011.*

* This Opinion and Order was originally filed un-
der seal on November 9, 2011 (docket entry 74),
pursuant to the protective order entered in this
action on August 31, 2011 (docket entry 23).
The parties were given an opportunity to advise
the Court of their views with respect to what
information, if any, should be redacted under the
terms of the protective order. The parties filed a
Notice of Proposed Redactions (docket entry 76)
on November 21, 2011, proposing certain redac-
tions, which the Court has adopted. According-
ly, the Court is reissuing its Opinion and Order
dated November 9, 2011, with the agreed redac-
tions indicated by three consecutive asterisks
within brackets ( [* * *] ).

Isaias "Cy" Alba, IV, PilieroMazza PLLC, Washington, D.C., for plaintiff. Pamela J. Mazza, Patrick T. Rothwell, Kathryn V. Flood, PilieroMazza PLLC, Washington, D.C., of counsel.

Christopher L. Krafchek, Trial Attorney, Anuj Vohra, Trial Attorney, Kirk T. Manhardt, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, Tony West, Assistant Attorney General, Department of Justice, Washington, D.C., for defendant. Robert Russo, Staff Attorney, Desiree DiCorcia, Staff Attorney, Frank V. DiNicola, Staff Attorney, Colin Nash, Staff Attorney, Department of Veterans Affairs, Eatontown, N.J., of counsel.

Claude P. Goddard, Husch Blackwell LLP, Washington, D.C., for defendant-intervenor CACI–ISS, Inc. Daniel J. Donohue, Sarah M. Graves, Husch Blackwell LLP, Washington, D.C., of counsel.

Richard J. Conway, Dickstein Shapiro LLP, Washington, D.C., for defendant-intervenor HP Enterprise Services, LLC. Michael J. Slattery, Pablo A. Nichols, Jade C. Totman, Dickstein Shapiro LLP, Washington, D.C., of counsel.

James J. McCullough, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for defendant-intervenor Science Applications International Corporation. Karen M. Soares, Brian M. Stanford, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

Plaintiff Standard Communications, Inc. filed a complaint against the United States alleging that the Department of Veterans Affairs ("DVA") improperly evaluated the proposal submitted by plaintiff in response to DVA's Request for Proposals ("RFP" or "Solicitation"), No. VA–118–10–RP–0052, and in so doing acted in a manner that was arbitrary, capricious, an abuse of discretion, and in violation of the Federal Acquisition Regulation ("FAR") and the terms of the Solicitation. Compl. (docket entry 1, Aug. 24, 2011); see also Pl.'s Mot. for J. on Administrative R. (docket entry 49, Sept. 23, 2011).

### I. Background

Plaintiff is a privately held corporation with its principal offices in Hume, Virginia. Compl. ¶ 7; see also Administrative R. ("AR") Tab 23, at 33310. It is a Service-Disabled Veteran–Owned Small Business ("SDVOSB") that "provid[es] telecommunications integration, support services and financial systems support exclusively to the U.S. Government." AR Tab 23, at 33422. In August 2010, plaintiff submitted a proposal in response to DVA's Solicitation. See AR Tab

23. It now challenges DVA's decision not to award it a contract.

## A. DVA's Solicitation for the T4 Program

On July 26, 2010, DVA issued an RFP for its Transformation Twenty–One Total Technology ("T4") Program. *See* AR Tab 3. The RFP sought proposals regarding "a total IT services solution encompassing, but not limited to software and IT products incidental to the solution, in conjunction with all services needed to integrate a system, network, or other IT service in order to meet [DVA's] mission requirements." AR Tab 3, at 163. The Performance Work Statement ("PWS") described general requirements of the contract. *Id.* More specific requirements were to be defined in individual task orders to be issued during the pendency of the contract. *Id.*

The agency anticipated entering into an Indefinite Delivery/Indefinite Quantity, Multiple Award Task Order contract with a five-year period of performance ("the T4 contract"). AR Tab 3, at 164. The RFP provided for a maximum selection of fifteen awardees, with at least four contracts being awarded to SDVOSBs and at least three being awarded to Veteran–Owned Small Businesses ("VOSB"). AR Tab 3, at 250. The ceiling value of the T4 Program is $12 billion, with a minimum $50,000 guaranteed to each awardee. AR Tab 3, at 158.

The Solicitation explained that "[a]ny awards to be made will be based on the best overall (i.e., best value) proposals that are determined to be the most beneficial to the Government." AR Tab 3, at 250. To evaluate the proposals under this standard, the RFP set forth five criteria: (1) technical, consisting of two sub-factors: (a) sample tasks and (b) management; (2) past performance; (3) veterans involvement; (4) small business participation commitment ("SBPC"); and (5) price. AR Tab 3, at 250–51. With regard to the weight to be assigned to each criterion, the Solicitation provided that "[t]he Technical factor is significantly more important than the Past

Performance factor, which is slightly more important than the Veterans Involvement factor, which is of equal importance to the SBPC factor, which is slightly more important than the Price factor." AR Tab 3, at 250. Additionally, when combined, criteria one through four were viewed as "significantly more important" than criterion five, price. *Id.*

To evaluate the proposals, DVA established a two-step process. *See id.* In the first step, DVA assessed offerors in the competitive range and made appropriate awards without regard to the offerors' size or status as SDVOSB or VOSB concerns. *Id.* If, during step one, four SDVOSB and three VOSB offerors were selected for awards, then DVA would not move on to the second step. *Id.* If this did not occur, DVA would continue its evaluation in step two, for which "large businesses and non-SDVOSB/VOSB small business offerors [were] eliminated from further consideration." AR Tab 3, at 251. DVA disclaimed that, "[i]f none of the proposals remaining in the competitive range are from SDVOSB or VOSB offerors, the Government reserves the right to make no further awards." *Id.*

### 1. Technical Criterion

To be considered for an award, the Solicitation provided that an offeror's proposal was required to receive a rating of "acceptable"[1] for the technical factor and both technical sub-factors. AR Tab 3, at 250. The RFP described the two technical sub-factors that were to be assessed when evaluating proposals. *See* AR Tab 3, at 251–52. Under the sample tasks sub-factor, offerors were to propose solutions to each of three sample tasks designed to be similar to task orders that would be issued under the T4 contract. AR Tab 3, at 251. An offeror's proposed solutions to the sample tasks were evaluated by assessing the offeror's understanding of the problem and the feasibility of its approach. AR Tab 3, at 251–52.

The second sub-factor, management, was to be similarly evaluated to determine an offeror's understanding of problems and the

---

1. The Court has omitted original capitalization in quotations from the administrative record referring to ratings for the various factors and sub-factors.

feasibility of the offeror's proposed approach. AR Tab 3, at 252. When assessing feasibility, DVA sought to determine "whether the offeror's management techniques and controls and team [would] meet the [PWS] requirements and whether the proposal provide[d] the Government with a high level of confidence of successful performance." *Id.*

### 2. Past Performance Criterion

DVA also used past performance as a factor in assessing the desirability of the proposals. This evaluative factor looked at "the relative risks associated with an offeror's likelihood of success in performing the [S]olicitation's requirements as indicated by that offeror's record of past performance." *Id.* The assessment was conducted by analyzing "the quality, relevancy[,] and recency" of the offeror's and its major subcontractors' past performances in the government contract arena. *Id.* The Solicitation specifically identified as significant to its analysis past contracts greater than $100,000 for the provision of services similar to those to be provided pursuant to the T4 Program. AR Tab 3, at 252–53. A "Past Performance Assessment Questionnaire" was attached to the Solicitation for offerors to employ when reporting past performance information. *See* AR Tab 3, at 258.

### 3. Veterans Involvement and SBPC Criteria

Under the veterans involvement criterion, evaluation credit was assigned to "an offeror (prime contractor) which [wa]s a[n SDVOSB] or a [VOSB]." AR Tab 3, at 253. Offerors that were not such entities could receive evaluation credit if they "agree[d] to subcontract 10% or more of the contract value to SDVOSB concerns or 12% or more of the contract value to VOSB concerns." *Id.*

To be considered for an award, the Solicitation provided that an offeror's proposal was required to receive a rating of "acceptable" for the SBPC factor. AR Tab 3, at 250. In determining this rating, offerors were to be evaluated based "on the level of small business commitment that they demonstrate[d] ... and their prior level of commitment to utilizing small businesses in performance of

prior contracts." AR Tab 3, at 253. Specifically, in its analysis the agency assessed, *inter alia,* "[t]he extent to which such firms ... [were] specifically identified in proposals," "[t]he extent of commitment to use such firms," and "[t]he realism of the proposal." *Id.* Additionally, the agency considered "[t]he extent to which the offeror [met] or exceed[ed] the Government's subcontracting goals." AR Tab 3, at 254. These goals included assigning five percent of the total contract value to Small Disadvantaged Businesses, three percent to Historically Underutilized Business Zone ("HUB Zone") Small Businesses, and five percent to Women–Owned Small Businesses. *Id.*

### 4. Price Criterion

The final evaluative factor in the agency's analysis of proposals was price. *See* AR Tab 3, at 250. As discussed above, price was the least weighty factor and was far surpassed in importance by the combination of the other four factors. *Id.* The RFP specified that the total contract price was the total labor price (consisting of the labor rates identified in the proposals multiplied by labor hours), travel costs, and other direct costs[2] for the five-year period. AR Tab 3, at 254. The Solicitation instructed an offeror and its subcontractors to provide "fully loaded labor rates for separately priced On–Site, Off–Site, and OCONUS [ ("Outside of the Contiguous United States") ] work locations for each of the five base years of the contract." *Id.* Each fully loaded labor rate was then multiplied by the appropriate level of labor hours over the five-year period. *Id.* Other applicable costs were then added to arrive at the total price of the contract if awarded. *Id.* The RFP informed potential offerors that "[t]he estimated labor hours ... [were] for evaluation purposes only and [did] not obligate the Government to award such labor hours." *Id.* Finally, with respect to price, the Solicitation mandated that the offeror "ensure that the rates proposed for all of the labor categories subject to the Service Contract Act (SCA) comply with the minimums specified by the

---

**2.** Other direct costs can include "incidental services for which there is not a labor category specified in the contract, travel, computer usage charges, etc." FAR 16.601(a).

applicable Department of Labor Wage Determination." *Id.*

## B. *Plaintiff's Response to the Solicitation and DVA's Initial Evaluation*

In response to DVA's Solicitation, plaintiff submitted a timely proposal on August 31, 2010. *See* AR Tab 23. The proposal described plaintiff's planned approach to performing the contract and the various task orders, addressing the areas specified in the Solicitation. AR Tab 23, at 33315–35.

Plaintiff's was one of 107 proposals that DVA received in response to its T4 RFP. *See* AR Tabs 27–133. Once it performed its preliminary evaluation of all the proposals, DVA established an initial competitive range of offerors in accordance with its Source Selection Evaluation Plan. AR Tab 135, at 41429–31; *see* AR Tab 2, at 131. The competitive range at this point consisted of twenty-two offerors and included plaintiff (designated as offeror number eighty seven). AR Tab 135, at 41430–31.

Discussions were then conducted with all offerors in the initial competitive range. AR Tab 135, at 41431; *see* AR Tabs 136–57. DVA released Items for Negotiation ("IFN") to each of the twenty-two offerors. *See* AR Tabs 136–57. DVA issued seven IFNs to plaintiff. *See* AR Tab 154. One of the seven IFNs informed plaintiff that its "price may not be fair and reasonable." AR Tab 154, at 41957. Others identified problems with, *inter alia*, the duration of the validity of plaintiff's proposal, AR Tab 154, at 41956, the level of detail in its proposal regarding cost control, AR Tab 154, at 41960, and the inability to verify a subcontractor's status as a HUB Zone small business. AR Tab 154, at 41962. Plaintiff replied to the IFNs on February 24, 2011. *See* AR Tab 177.

## C. *DVA's Evaluation of the Proposals*

After DVA received the offerors' responses to the IFNs, it eliminated one offeror from the competitive range. AR Tab 204, at 79112. Therefore, twenty-one offerors remained from which DVA could select up to fifteen for awards pursuant to the terms of the Solicitation. *See id.* Once DVA established the final competitive range, it conducted its two-step analysis. After reviewing the proposals in the first step, DVA selected nine awardees, eight of which were non-SDVOSB/VOSB concerns and one of which was an SDVOSB. AR Tab 280, at 83097; *see also* AR Tab 255, at 82276. Plaintiff was not among these nine awardees. *See* AR Tab 280, at 83097.

Because the first step of the evaluative process did not result in awards to three VOSBs and four SDVOSBs, DVA moved on to the second step. *See* AR Tab 280, at 83099. As noted, one of the awardees selected in step one qualified as an SDVOSB. AR Tab 280, at 83097; *see* AR Tab 255, at 82276. Therefore, with a total of nine contracts awarded, one to an SDVOSB, DVA had a maximum of six contracts to award to SDVOSB/VOSB concerns in the second step. Eight SDVOSB/VOSB concerns, including plaintiff, remained in the competitive range, and DVA attempted to evaluate each to discern which represented the best-value to the Government. AR Tab 280, at 83099–100. After conducting its analyses, six awardees were selected. *Id.* Plaintiff was not included among the six awardees selected in step two. *See id.*

In the Source Selection Decision ("SSD") document, the Source Selection Authority ("SSA") discussed plaintiff's proposal twice, both times in regard to her analyses under the second step of the process. *See id.* First, she discussed plaintiff's proposal in comparison to proposals submitted by offerors 1 (7 Delta, Inc.), 20 ( [* * *] ), and 49 (Information Innovators, Inc.). AR Tab 280, at 83099. She concluded that the four proposals were "essentially equal in technical quality," but that the proposals of offerors 1 (7 Delta, Inc.), 20 ( [* * *] ), and 49 (Information Innovators, Inc.) provided a lower price and, therefore, "represent[ed] a better overall value to the Government." *Id.* Second, the SSA addressed plaintiff in comparison to proposals submitted by offerors 3 (Adams Communication & Engineering Technology ("Adams")), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation). AR Tab 280, at 83100. She determined that plaintiff's proposal, which was higher priced than those of the other

three offerors, did "not exhibit sufficient superiority in the non-Price factors to warrant award." *Id.*

After the six step-two awardees were chosen, bringing the total awardees under the Solicitation to fifteen (seven SDVOSB/VOSB concerns, one selected in step one and six selected in step two, and eight non-SDVOSB/VOSB concerns selected in step one), DVA discovered that one of the awardees chosen in step two of the process, namely offeror 20 ( [* * *] ), did not qualify as an SDVOSB or VOSB concern. AR Tab 280, at 83102. Therefore, that offeror could only have received an award in the first step and was ineligible to receive an award in the second step. *Id.* In an addendum to the SSD document, the SSA confirmed that she had reviewed this offeror's proposal in the first step and that it did not offer a better value than the nine awardees chosen during that phase of the evaluation. *Id.* Accordingly, offeror 20 ( [* * *] ) was not selected for award, leaving fourteen awardees, only six of which were SDVOSB/VOSB concerns, one less than required under the Solicitation.

After removing offeror 20 ( [* * *] ) from the group of selected proposals, DVA needed to make the fifteenth contract award. Therefore, it had to determine which SDVOSB/VOSB offeror remaining in the competitive range—namely plaintiff and offeror 37 (FirstView Federal TS)—represented the best value to the Government. In documenting her tradeoff analysis between the two offerors, the SSA stated that, though plaintiff's proposal was technically superior, it was higher in price than offeror 37's (FirstView Federal TS) proposal. *Id.* She then stated that plaintiff's "higher-priced proposal [did] not exhibit sufficient superiority in the non-Price factors to warrant an award." *Id.* Accordingly, DVA awarded the final contract to offeror 37 (FirstView Federal TS). *Id.*

### D. Protests Before the Government Accountability Office

A number of protests were filed before the Government Accountability Office ("GAO") by offerors excluded from the initial competitive range. Def.'s Consolidated Partial Mot. to Dismiss &, in the Alternative, Resp. to Pl.'s Mot. for J. on AR ("Def.'s Consol. Mot.") 27 (docket entry 59, Oct. 7, 2011). One protest, filed by D & S Consultants, Inc., was not finally resolved until July 11, 2011. AR Tab 234. Because of this, DVA deemed it appropriate to stay the award to awardee 81 (Science Applications International Corporation ("SAIC")), which had been selected to receive a contract in the first step. Def.'s Consol. Mot. 27. In doing so, DVA believed it was in compliance with the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553. *Id.* DVA had mailed letters dated July 5, 2011 to the offerors that remained in the competitive range at that point, including SAIC and plaintiff, in order to apprise them of the possibility that an additional award might be available pending resolution of the protest. AR Tabs 285–91. Once GAO rendered its decision, DVA officially issued the final award to SAIC.

### E. Instant Action

On August 24, 2011, plaintiff filed its complaint in this Court alleging that DVA violated applicable law and regulations when it evaluated the offerors for the T4 Program. *See* Compl.; *see also Am.* Compl. (docket entry 31, Sept. 1, 2011). On September 23, 2011, plaintiff and defendant filed cross-motions for judgment on the Administrative Record (docket entry 46). Defendant-intervenor HP Enterprise Services LLC's ("HP") also filed a motion for judgment on the Administrative Record (docket entry 45, Sept. 23, 2011). On October 7, 2011, plaintiff filed a response to defendant's motion for judgment on the Administrative Record (docket entry 61). Defendant-intervenors CACI–ISS, Inc., HP, and SAIC filed responses to plaintiff's motion for judgment on the administrative record (docket entries 55, 57, 60, Oct. 7, 2011). Defendant filed a response to plaintiff's motion for judgment on the administrative record and a motion to dismiss two counts of plaintiff's amended complaint. On October 14, 2011, defendant and plaintiff filed simultaneous replies in response to the motions for judgment on the administrative record (docket entries 65 & 67). Defendant-intervenors HP and SAIC also filed replies (docket entries 64 & 66, Oct. 14, 2011). On

October 20, 2011, this Court heard oral argument from the parties in support of their respective positions. At the conclusion of the hearing, the Court took the matter under advisement and ordered the parties to submit supplemental briefing. On October 27, 2011, defendant, defendant-intervenor HP, and plaintiff filed supplemental briefs with respect to certain demonstrative exhibits tendered by the Government for the first time at the October 20 hearing (docket entries 71–73). For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion for judgment on the administrative record, **GRANTS IN PART** and **DENIES IN PART** defendant's and defendant-intervenor HP's motions for judgment on the administrative record, and **DENIES** defendant's motion to dismiss as moot. The Court also orders certain tailored injunctive relief in favor of plaintiff.

## II. Analysis

### A. DVA's Award to Adams Was Reasonable and Did Not Deviate from the Solicitation's Evaluation Scheme or from Applicable Law

1. *DVA Properly Evaluated the Sample Tasks Sub–Factor and Properly Exercised Its Discretion When It Awarded Plaintiff a Rating of "Acceptable" for that Sub–Factor*

■ Plaintiff takes issue with the fact that Adams was awarded a contract when it received an "unacceptable" rating for one of the sample tasks under the sample tasks sub-factor of the technical factor. Pl.'s Mot. for J. on AR 9–13. To support its argument, plaintiff quotes the Solicitation, which states that "[t]o receive consideration for award, a rating of no less than 'acceptable' must be achieved for the Technical factor, *all* technical sub-factors, and the SBPC factor." *Id.* at 9 (quoting AR Tab 4, at 435) (internal quotation marks omitted); *see also* AR Tab 3, at 250. Plaintiff interprets "all technical sub-factors" to mean that each of the three sample tasks under the sample-tasks sub-factor are themselves sub-factors. Pl.'s Mot. for J. on AR 10 ("Use of the term 'all' plainly suggests that any evaluated item which is used to compute a rating for the overall

Technical factor is within the definition of 'sub-factor.' "). Because plaintiff interprets each of the sample tasks as individual technical sub-factors, and because Adams received a rating of "unacceptable" for the first sample task, plaintiff argues that Adams did not receive an "acceptable" rating for all technical sub-factors and, therefore, should not have been considered for an award per the terms of the Solicitation.

In response to this argument, defendant relies on the plain language of the Solicitation, which explains that the technical factor is comprised of two sub-factors, management and sample tasks. Def.'s Mot. for J. on AR 9 (citing AR Tab 3, at 251). The sample tasks sub-factor, defendant argues, contains three sample tasks that are of equal weight. *Id.* (citing AR Tab 3, at 251). Accordingly, defendant argues, the sub-factors to which the Solicitation refers are management and sample tasks, not the individual sample tasks that together make up the sample tasks sub-factor.

When analyzing this issue, the Court must "begin with the plain language of an agency's solicitation. Unless it is manifest that another meaning was intended and understood by all parties, the text of the solicitation must be accorded its plain and ordinary meaning." *Linc Gov't Servs., LLC v. United States,* 96 Fed.Cl. 672, 708 (2010) (citations omitted) (citing *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1353 (Fed.Cir.2004)); *see also Pac. Helicopter Tours, Inc. v. United States,* No. 06–613C, 2007 WL 5171114, at *15 (Fed.Cl.2007) ("[T]he plain language of the Solicitation presents the starting point for the court's inquiry . . . ." (citing *Banknote Corp. of Am., Inc.,* 365 F.3d at 1353)). According to the terms of the Solicitation, the technical factor contains two sub-factors, sample tasks and management. AR Tab 3, at 251. The sample tasks sub-factor "include[d] three sample tasks of equal importance," which were evaluated by assessing a proposal's demonstrated understanding of the problems and feasibility of approach. AR Tab 3, at 251–52. The Solicitation's use of the term "all" when it stated that consideration for an award necessitates receiving no less than "acceptable" for "all Technical sub-

factors" could have been more precise. Although it suggests the possibility that there were many sub-factors when, in fact, there were only two, elsewhere in the Solicitation, DVA makes clear that it contemplated only two sub-factors, one of which, the sample tasks sub-factor, included three separate sample tasks which were individually evaluated to arrive at the overall rating for the sample tasks sub-factor. *See* AR Tab 3, at 238–39, 251–52. The language of the Solicitation makes it apparent that there were only two technical sub-factors. Accordingly, plaintiff's interpretation is unpersuasive.

Adams received ratings of "good," "acceptable," and "unacceptable" for its proposals with respect to the three sample tasks within the sample-tasks sub-factor. As DVA argues, these ratings can be understood to average out to a total rating of "acceptable" for the entire sub-factor. Def.'s Consol. Mot. 12. Plaintiff argues that a proposal that receives an "unacceptable" rating for any portion of the technical factor should not be considered for an award at all because of the demonstrated inability to complete certain tasks that will be requested under the T4 contract. Pl.'s Resp. in Supp. of Its Mot. for J. on AR & Opp'n to Def. & Def.-Intervenors' Mots. for J. on AR 4. However, the determination of acceptability is within the contracting officer's discretion. *See Dyn-Corp Int'l LLC v. United States,* 76 Fed.Cl. 528, 537 (2007) (explaining that, in a best-value procurement, the contracting officer has a wide range of discretion). Here, the Court is not persuaded that DVA's interpretation was improper or irrational. On the contrary, the Court finds that the award to Adams was consistent with the plain language of the Solicitation.

2. *Plaintiff Waived Its Argument that DVA Violated the Veterans First Program When It Awarded a Contract to Adams, a VOSB, over Plaintiff, an SDVOSB*

Plaintiff contends that DVA violated the Veterans First Program, which, when applicable, requires that a procuring entity give SDVOSB concerns priority over VOSB concerns. Pl.'s Mot. for J. on AR 13–14; *see* 38 U.S.C. §§ 8127(i), 8128(a); *see also* Veterans Affairs Acquisitions Regulation ("VAAR")

819.7004. Plaintiff, an SDVOSB, argues that it should have been given priority over Adams, a VOSB. Pl.'s Mot. for J. on AR 13–14. Therefore, plaintiff submits that DVA did not properly follow the mandates of law and regulation when it awarded a contract to Adams and not plaintiff. *Id.*

■ Plaintiff's argument is properly characterized as a challenge to the Solicitation, which explained how DVA planned to evaluate the proposals, detailing the way in which DVA would award credit to SDVOSBs and VOSBs under the veterans involvement factor pursuant to VAAR 852.215–70. AR Tab 3, at 253. Additionally, DVA made clear that it would award four contracts to SDVOSBs and three to VOSBs, AR Tab 3, at 250, not seven contracts in total to some combination of SDVOSB and VOSB concerns with preference to the former. The Solicitation also discussed DVA's two-step evaluative process for selecting proposals for contract awards. AR Tab 3, at 250–51. It explained that, during the first step, all offerors would be evaluated without regard to size or status and that, during the second step, SDVOSBs and VOSBs remaining in the competitive range would be evaluated. *Id.* Therefore, it was plain from the language of the Solicitation that priority was to be given to SDVOSB and VOSB concerns through the veterans involvement factor. Plaintiff was aware of DVA's process when it submitted its proposal. Accordingly, because plaintiff did not raise the issue of priority as between the two types of offerors before the close of the biding process, the challenge is untimely and plaintiff has effectively waived this issue. *See Blue & Gold Fleet L.P. v. United States,* 492 F.3d 1308, 1313 (Fed.Cir.2007).

■ Even absent a waiver and assuming the Veterans First Program applied to the Solicitation, the Court concludes that plaintiff would lose on the merits of this argument. Under the system DVA developed for this Solicitation, "full credit" was awarded when the "[o]fferor [was] a prime and [was] properly registered in the Vendor Information Pages as an SDVOSB." AR Tab 279, at 83021. DVA awarded "partial credit" to a proposal when the "[o]fferor [was] a prime and [was] properly registered in the Vendor

Information Pages as a VOSB." *Id.* Additionally, an offeror could receive "minor" or "no" credit for the veterans involvement factor. *Id.* Here, plaintiff was awarded "full credit" for the veterans involvement factor because of its status as an SDVOSB. AR Tab 279, at 83023. Adams was only awarded "partial credit." *Id.* Therefore, plaintiff was, in fact, given "priority" over Adams with regard to the veterans involvement factor. Accordingly, even if there had been no waiver, plaintiff's position on the priority issue is unpersuasive on the merits.

B. *DVA's Analysis Was Sufficiently Documented and Explained as to Its Comparison of Plaintiff to Offerors 1 (7 Delta, Inc.), 20 ( [\* \* \*] ), and 49 (Information Innovators, Inc.), but DVA's Best–Value Tradeoff Analyses Were Insufficiently Documented and Explained as to Its Comparison of Plaintiff to Offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), 95 (Technatomy Corporation), and 37 (FirstView Federal TS)*

Plaintiff contends that the SSA performed improper best-value analyses with respect to plaintiff. Specifically, plaintiff argues that the SSA placed "arbitrary and improper emphasis ... on price" in her best-value analyses and that the DVA "failed to perform a full and meaningful best value analysis through its failure to weigh whether an offeror was either an SDVOSB or VOSB concern." Pl.'s Mot. for J. on AR 17. Plaintiff also contends that the best-value analyses, if conducted at all, were not adequately documented or explained as mandated by FAR and by case law. *Id.* at 17–20.

Under FAR, "[a] tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101–1(a). When conducting this analysis, the SSA has the following duties and obligations:

The [SSA's] decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

FAR 15.308.

The court in *Serco Inc. v. United States* explained the process by which FAR 15.308 is properly applied. 81 Fed.Cl. 463, 496–97 (2008). First, the agency must "make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford." *Id.* at 496. An agency must "do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price." *Id.* at 497. Second, "the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors." *Id.* However, "logic suggests that as [the] magnitude [of the price differential between offerors] increases, the relative benefits yielded by the higher-priced offer must also increase." *Id.* Third, the agency must document its tradeoff analysis. *Id.* With regard to the nature of the documentation, "[c]onclusory statements, devoid of any substantive content ... fall short of [the FAR] requirement ...[, and] generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions." *Id.*

1. *DVA's Analysis of Plaintiff and Offerors 1 (7 Delta, Inc.), 20 ( [\* \* \*] ), and 49 (Information Innovators, Inc.) Was Proper, and DVA's Documentation and Explanation Were Sufficient*

█ In the SSD document, the SSA explained that "[t]he proposals submitted by

Offerors 1 [ (7 Delta, Inc.) ], 20 [ ( [* * *] ) ], and 49 [ (Information Innovators, Inc.) ], when compared to Offeror 87, [were] essentially equal in technical quality at lower evaluated prices and, therefore, represent[ed] a better overall value to the government." AR Tab 280, 83099.

In addition to its allegations about arbitrariness and inadequate documentation, plaintiff suggests that the SSA did not adequately explain why she determined that these offerors were technically equal. Pl.'s Mot. for J. on AR 19–20. However, plaintiff does not point to any underlying facts that cause the Court to question whether the SSA properly concluded that the proposals of these offerors were technically equal. *See id.* Moreover, although the Court recognizes that the SSA's statements in this regard are conclusory and could well have included more detail, the SSD document includes a table of rankings, and it references the Source Selection Evaluation Board ("SSEB") briefing, AR Tab 280, at 83096–97, both of which support the SSA's finding that the proposals were technically equal.[3]

According to the SSEB briefing provided to the SSA, the findings of which are reflected in the table in the SSD document, plaintiff and offerors 1 (7 Delta, Inc.), 20 ( [* * *] ), and 49 (Information Innovators, Inc.) all received ratings of "good" for the technical factor, AR Tab 279, at 82926–27, 82940–41, 82952–53, 82960–61; "low risk" for the past performance factor, AR Tab 279, at 82976–77, 82990–91, 83002–03, 83010–11; and "full credit" for the veterans involvement factor, AR Tab 279, at 83023. The only non-price factor in which one offeror differed from the others was SBPC, for which offeror 1 (7 Delta, Inc.) was rated "outstanding" and plaintiff and offerors 20 ( [* * *] ) and 49 (Information Innovators, Inc.) were rated "acceptable." AR Tab 279, at 83071. Accordingly, the SSA was rational in her determination that these offerors were "essentially equal in technical quality" when technical refers to all non-price factors combined.[4]

With regard to price, offeror 1 (7 Delta, Inc.) had a final evaluated price of $9,819,470,669, AR Tab 279, at 83074; offeror 20 ( [* * *] ) had a final evaluated price of $9,261,152,446, AR Tab 279, at 83081; offeror 49 (Information Innovators, Inc.) had a final evaluated price of $8,470,370,919, AR Tab 279, at 83087; and plaintiff had a final evaluated price of [* * *], AR Tab 279, at 83091. Plaintiff, therefore, was priced higher than any of the other offerors included in this analysis.

That the SSA did not engage in a detailed analysis to justify her choosing lower-priced proposals that were technically equal to plaintiff's higher-priced proposal does not amount to a violation of the FAR documentation requirement. *See* FAR 15.308. As this court noted in *Carahsoft Technology Corp. v. United States,* "where proposals are technically equal, a best-value tradeoff analysis between price and technical factors is not required." 86 Fed.Cl. 325, 349 (2009) (citing *Consol. Eng'g Servs., Inc. v. United States,* 64 Fed.Cl. 617, 635 n. 26 (2005)). "No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is

---

**3.** The process of determining equality or lack thereof is a precursor to conducting a tradeoff analysis, should one be required. *See Carahsoft Tech. Corp. v. United States,* 86 Fed.Cl. 325, 349 (2009) (explaining that a tradeoff analysis is not required if proposals are technically equal).

**4.** This is not a case similar to, for example, *Magellan Health Services* and *Johnson Controls World Services, Inc.,* in which, although the evaluation records revealed differences with respect to the merits of the proposals, the SSA found technical equality without explanation. *Magellan Health Servs.,* B– 298912, 2007 WL 1469049, at *15 (Comp.Gen. Jan. 5, 2007) (explaining that, although one offeror scored higher with regard to an evaluative factor than another offeror, "the

source selection decision [was] devoid of any discussion as to how, or even if, the contracting officer determined before award that the offerors' proposals were technically equal"); *Johnson Controls World Servs., Inc.,* B– 289942 *et al.,* 2002 WL 1162912, at *10 (Comp.Gen. May 24, 2002) ("Where, as here, the evaluation record evidences relative differences in proposal merit, general statements of equivalency are inadequate to show equivalency; the agency must compare the relative merits of the proposals in a manner that reasonably supports a determination of equivalency."). Here, the documentation is sufficient to permit the Court to conclude, as it does, that the SSA's findings of technical superiority and equality should be adopted.

available." *Id.* In fact, the language of *Carahsoft* states that an agency is "compelled" to choose the lower-priced proposal when they are otherwise technically equal. *Id.* at 350. Accordingly, because plaintiff and offerors 1 (7 Delta, Inc.), 20 ( [* * *] ), and 49 (Information Innovators, Inc.) were technically equal but plaintiff was higher in price than each of the other three offerors, the SSA did not have to engage in a best-value tradeoff analysis with respect to these offerors, and her overall conclusion was both reasonable and adequately documented.

2. *The Documentation and Explanation of DVA's Best–Value Tradeoff Analysis Regarding Plaintiff and Offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation) Were Insufficient*

■ As noted, FAR requires that the SSD be well documented with regard to its tradeoff analyses. FAR 15.308. To be well documented, the SSD must contain more than conclusory and generalized statements. *Serco Inc.*, 81 Fed.Cl. at 497. With regard to plaintiff and offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation), the SSD document stated: "The proposal submitted by [plaintiff] is a higher-priced proposal than the proposals submitted by Offeror 3 [ (Adams) ] ..., Offeror 9 [ (By Light Professional IT Services, Inc.) ] ..., and Offeror 95 [ (Technatomy Corporation) ].... I have determined that this higher priced proposal does not exhibit sufficient superiority in the non-Price factors to warrant award." AR Tab 280, at 83100.

■ As demonstrated in the SSD document, offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation) all received a ranking of "acceptable" for the technical factor, AR Tab 280, at 83096–97, meaning that their proposals "satisfie[d] all of the Government's requirements, contain[ed] *minimal detail,* demonstrate[d] a *minimal understanding* of the problems, and [was] *minimally feasible* (moderate to high degree of risk) in meeting the Government's requirements." AR Tab 284, at 83204. Plaintiff received a "good" ranking for the technical factor. AR Tab

280, at 83097. A "good" rating indicated a proposal "that satisfie[d] all of the Government's requirements, contain[ed] *adequate detail,* demonstrate[d] an *understanding* of the problems and [was] *feasible* (low to moderate degree of risk) in meeting the Government's requirements." AR Tab 284, at 83204. Accordingly, plaintiff was ranked superior in the technical factor—the most important factor—as compared to the other three offerors.

With regard to the other non-price factors—namely past performance, SBPC, and veterans involvement—plaintiff fared well when compared to the other three offerors. All four offerors were rated "low risk" with regard to the past performance factor. AR Tab 279, at 82978–79, 82984–85, 83010–11, 83016–17. Under the veterans involvement factor, plaintiff, offeror 9 (By Light Professional IT Services, Inc.), and offeror 95 (Technatomy Corporation) received "full credit," and offeror 3 (Adams) received "partial credit." AR Tab 279, at 83021–23. Under the SBPC factor, offeror 3 (Adams) received a rating of "outstanding," and plaintiff and offerors 9 (By Light Professional IT Services, Inc.) and 95 (Technatomy Corporation) received a rating of "acceptable." AR Tab 279, at 83071. Accordingly, plaintiff and offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation) were equal in the past performance factor; plaintiff was equal to two and better than one in the veterans involvement factor; plaintiff was equal to two, but ranked lower than one in the SBPC factor; and plaintiff was ranked higher than all the offerors with respect to the technical factor, the most significant evaluative factor of the five according to the Solicitation.

With regard to price, plaintiff's proposal was higher than the proposals of offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation). Plaintiff proposed a final evaluated price of [* * *]. AR Tab 279, at 83091. Offeror 3 (Adams) proposed a final price of $7,619,760,088, AR Tab 279, at 83075; offeror 9 (By Light Professional IT Services, Inc.) proposed $7,265,761,129, AR Tab 279, at 83078; and offeror 95 (Technatomy Corpora-

tion) proposed $8,811,539,306. AR Tab 279, at 83094. Therefore, plaintiff's price was [* * *] higher than the next highest-priced offeror in this group—offeror 95 (Technatomy Corporation).

According to *FirstLine Transportation Security, Inc. v. United States,*

> when selecting a low-price technically inferior proposal in a best-value procurement where non-price factors are more important than price, it is not sufficient for the Government to simply state that a proposal's technical superiority is not worth the payment of a price premium. Instead, the Government must explain specifically *why* it does not warrant a premium.

100 Fed.Cl. 359, 381 (2011); *cf. Indus. Prop. Mgmt., Inc. v. United States,* 59 Fed.Cl. 318, 324 (2004) ("[T]he government is only required to make a 'cost/technical tradeoff ... where one proposal is rated higher technically than another, but the other is lower in cost.'" (quoting *State Mgmt. Servs., Inc.,* B–255528 *et al.,* 1995 WL 19600, at *5 (Comp. Gen. Jan. 18, 1995))). Here, the SSA provided no such explanation when she determined that plaintiff's proposal did not warrant the higher price.

Defendant argues that the SSA's statements were satisfactory because FAR only requires explanatory documentation when a higher-priced proposal is selected over lower-priced proposals. Hearing at 11:26:24, *Standard Communications, Inc. v. United States,* No. 11–530C (Fed.Cl. Oct. 20, 2011). Defendant highlights the following FAR language to support its argument: "[D]ocumentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs." FAR 15.308.

Defendant is partially correct in its reading of FAR 15.308—when selecting a proposal that involves "additional cost," the rationale for the decision must be documented. However, defendant reads the provision to require documentation only in that scenario. In its interpretation, defendant overlooks the qualifying term "including," a word that indicates that the material that follows is neither exclusive nor exhaustive. *See Black's Law Dictionary* 831 (9th ed. 2009) (defining "in-

clude" as "[t]o contain as a part of something," and explaining that "[t]he participle *including* typically indicates a partial list"); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1345 (Fed.Cir. 2003) (noting, in the context of patent law, that "include" means the same thing as "comprise," which indicates that "the named elements are essential, but other elements may be added and still form a construct within the scope of the claim" (quoting *Genentech, Inc. v. Chiron Corp.,* 112 F.3d 495, 501 (Fed.Cir. 1997))) (internal quotation marks omitted). Therefore, the Court finds that defendant's interpretation is unpersuasive. FAR 15.308 does not excuse an SSA from documenting his or her reasoning for declining to pay a premium for a higher-priced, technically superior proposal, particularly in a situation where, as here, the non-price factors were said to be more important than price.

Defendant also argues that, even if additional explanatory documentation were required, that requirement was satisfied because the SSA stated that she reviewed the findings that the SSEB and the Source Selection Advisory Council ("SSAC") submitted to her and considered those in her decision-making process. *See* Hearing at 10:19:39, *Standard Communications, Inc. v. United States,* No. 11–530C (Fed.Cl. Oct. 20, 2011). Specifically the SSA states: "Based upon the findings of the [SSEB] and the [SSAC] as presented to me on March 24, 2011, I compared the proposals, giving appropriate consideration to the evaluation criteria set forth in the solicitation and their relative importance." AR Tab 280, at 83097. Defendant contends that this blanket reference to the briefings prepared by the SSEB and the SSAC is enough to show that the SSA engaged in a thorough best-value tradeoff analysis with respect to the offerors. Hearing at 10:20:06, *Standard Communications, Inc. v. United States,* No. 11–530C (Fed.Cl. Oct. 20, 2011).

Although the SSA may have been fully briefed, she did not document her consideration of the facts and figures presented to her in a way that satisfies FAR. For example, in *FirstLine,* the court found that the agency's documentation of its best-value

tradeoff analysis was inadequate when the SSEB, which conducted the tradeoff analysis in that case, included "nothing more than a selective summary of the ratings, strengths, and weaknesses assigned to the proposals by lower-level evaluators." 100 Fed.Cl. at 380. Including a summary of the evaluations of each entity did not amount to a meaningful comparison of the proposals. *Id.* Furthermore, the Court stated that "[t]he simple physical juxtaposition of otherwise unrelated discussions of the proposals does not address the relative benefits and disadvantages of those competing proposals, nor does it explain why a higher-priced, but technically superior, proposal does not merit its higher price." *Id.* Accordingly, because the agency failed to document an active comparison of the proposals at issue, the court found that the agency violated FAR's documentation requirement.

Here, the SSA did even less than the SSEB in *FirstLine.* The *FirstLine* SSEB included in its tradeoff analysis a regurgitation of analyses that other evaluators had provided. The SSA here did not even go that far. Rather she alluded to a chart in the SSD document and stated only that she considered the factors presented to her by others. She also made only short, conclusory statements about plaintiff's proposal. *See* AR Tab 280, at 83100. She never delved into an analysis of the proposals nor explained why plaintiff's higher-priced proposal did not "exhibit sufficient superiority in the non-Price factors," although it was ranked higher in the technical factor than the other offerors. *See id.* She simply made reference to a briefing by the SSEB. *See id.*

Accordingly, the Court finds that the SSA's best-value analysis with respect to plaintiff and offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation) was insufficiently documented in violation of FAR.[5] Without adequate documentation, it is not possible to determine whether the SSA engaged in an appropriate best-value tradeoff analysis.

3. *The Documentation and Explanation of DVA's Best–Value Tradeoff Analysis Regarding Plaintiff and Offeror 37 (FirstView Federal TS) Were Insufficient*

After awardees were determined, DVA discovered that offeror 20 ( [* * *] ) did not qualify as an SDVOSB or a VOSB concern; therefore it could only have received an award in step one of the evaluation process. *See* AR Tab 280, at 83102. However, it was not among the nine awardees selected in that step. Therefore, DVA engaged in an analysis of the two SDVOSB/VOSB offerors remaining in the competitive range, namely plaintiff and offeror 37 (FirstView Federal TS). *See id.* In so doing, the SSD document explained that plaintiff submitted a "technically superior proposal, which was [* * *]% ( [* * *] ) higher in price than the technically acceptable proposal submitted by Offeror 37 [ (FirstView Federal TS) ]." *Id.* Indeed, plaintiff and offeror 37 (FirstView Federal TS) were both rated "acceptable" in the SBPC factor, AR Tab 279, at 83071; awarded "full credit" in the veterans involvement factor, AR Tab 279, at 83023; and deemed "low risk" in the past performance factor, AR Tab 279, at 82992–93, 83010–11. Accordingly, the only non-price factor in which they differed was the technical factor, for which offeror 37 (FirstView Federal TS) was rated "acceptable" and plaintiff was rated "good." AR Tab 279, at 82942–43, 82960–61.

After noting that plaintiff "submitted a technically superior proposal," the SSA stated, "I hereby determine that this higher-priced proposal does not exhibit sufficient superiority in the non-Price factors to warrant an award." AR Tab 280, at 83102. As discussed above, when selecting a lower-priced, technically inferior proposal, the SSD must explain why the agency did not think it appropriate to pay a premium for a technically superior proposal. *FirstLine Transp. Sec., Inc.,* 100 Fed.Cl. at 379–80. There is

---

**5.** Note that a reference to a table of rankings as proof of documentation of an equality determination in the phase preceding the tradeoff analysis is not inconsistent with the finding that the same table is inadequate documentation of the reasoning employed in the best-value tradeoff analysis. The latter process requires a more in-depth analysis of proposals in order to adequately explain award decisions.

nothing in the record that demonstrates DVA's rationale for selecting a technically inferior proposal, other than its lower price, a factor that was to be given the least weight according to the terms of the Solicitation. Additionally, as discussed, the SSA's reference to the briefings she received from the SSEB and the SSAC did not satisfy the FAR documentation requirement and does not adequately explain the rationale for her decision. The SSA's documentation and explanation of her best-value tradeoff analysis with respect to plaintiff and offeror 37 (FirstView Federal TS) are insufficient and not in compliance with FAR. Without adequate documentation and a more complete statement of her rationale, the Court cannot conclude whether the SSA engaged in an appropriate best-value tradeoff analysis.

### C. DVA's Award to Offeror 81 (SAIC) Was Not Improper

Plaintiff contends that DVA violated the terms of its Solicitation, specifically its two-step process for selecting awardees, when it awarded a contract to offeror 81 (SAIC). Pl.'s Mot. for J. on AR 22–23. As evidence, plaintiff points to a series of July 5, 2011 letters explaining that the fifteenth award was still open and that plaintiff and offeror 81 (SAIC) were among those being considered. *Id.* at 23; *see also* AR Tabs 285–91. After this letter was issued, plaintiff states that offeror 81 (SAIC) publicly announced that it had received the final award, implying that it had been selected for award sometime between the July 5, 2011 letter and its announcement. Pl.'s Mot. for J. on AR 23. Plaintiff alleges that, at this point, only SDVOSB and VOSB concerns could be considered because the evaluation process was in the second of its two steps. *Id.* Therefore, plaintiff contends that DVA violated the terms of its Solicitation.

Despite plaintiff's argument, the record is clear that DVA employed the two-step evaluation process as explained in its Solicitation. *See* AR Tab 3, at 250–51; Tab 280. In the first step, DVA selected offerors that represented the best value to the Government without regard to their size or status as SDVOSBs or VOSBs. AR Tab 3, at 250.

This resulted in the selection of nine offerors, eight of which were non-SDVOSB/VOSB concerns. AR Tab 280, at 83097. Offeror 81 (SAIC) was included in this first group of non-SDVOSB/VOSB concerns selected for an award. *Id.* Therefore, it was properly selected during step one of the two-step evaluation process.

■ With regard to the confusion generated by the July 5, 2011 letters, defendant explains that a number of bid protests were filed with GAO before the awards could be made to the selected awardees. Def.'s Consol. Mot. 27. DVA believed that it would be desirable in light of CICA to stay the awards until the protests were resolved. *Id.; see* 31 U.S.C. § 3553(c). Defendant states that all but one of these protests were favorably resolved by June 30, 2011. Def.'s Consol. Mot. 27. The remaining protester was a large business, a non-SDVOSB/VOSB concern. *Id.; see also* AR Tab 234 (containing GAO's decision on the bid protests filed by D & S Consultants, Inc.). Therefore, DVA decided to hold a similar entity's award, namely offeror 81's (SAIC) award, in abeyance and inform it, as well as the other offerors, through identical letters that a final award was being held open. Def.'s Consol. Mot. 27; *see* AR Tabs 285–91. This was an action that DVA reasonably believed to enhance compliance with CICA. Def.'s Consol. Mot. 27. Therefore, although offeror 81 (SAIC) may not have been officially awarded a contract until after the resolution of D & S Consultants, Inc.'s GAO protest, *see* Def.'s Cross–Mot. for J. on AR 24 n. 3 ("SAIC was not awarded its contract … until July 18, 2011 due to a GAO protest"); Def.'s Consol. Mot. 27, the record shows that offeror 81 (SAIC) was properly selected for an award during the first step of the two-step evaluative process in March of 2011. *See* AR Tab 280, at 83097.

### D. Plaintiff Waived Its Argument With Regard to the Issue of Whether D VA Violated the Veterans First Program When It Allegedly Gave Priority to Non–Veteran Owned Companies

Plaintiff contends that DVA violated applicable statutes and regulations when it con-

ducted its evaluation of the offerors by first looking at the proposals without regard to the offerors' statuses as SDVOSBs or VOSBs. Pl.'s Mot. for J. on AR 23–26. Defendant argues that this Court lacks jurisdiction to review this claim because it has been waived pursuant to *Blue & Gold*. Def.'s Consol. Mot. 4–7; *see* 492 F.3d 1308.

■ As defendant submits, plaintiff's argument is untimely and plaintiff has effectively waived it pursuant to *Blue & Gold*, 492 F.3d 1308. Under *Blue & Gold*, a party waives a challenge to the terms of the Solicitation if it did not raise that challenge before the end of the bidding process. *Id.* at 1313–14. Here, DVA explicitly discussed its two-step evaluation process in the Solicitation, AR Tab 3, at 250–51, and apprised all potential offerors of it in pre-solicitation documents. *See* AR Tab 2.2, at 152.004; AR Tab 2.5, at 152.074–.075; AR Tab 2.7, at 152.152; AR Tab 2.8, at 152.223, 152.251. Plaintiff was aware of this process when it submitted a proposal in response to the RFP. Plaintiff could easily discern that DVA did not separate SDVOSB/VOSB concerns from the competitive range at the first step in its evaluative analysis. It had the opportunity to object to that procedure during the solicitation process and failed to do so. *See Vanguard Recovery Assistance v. United States*, 99 Fed.Cl. 81, 90 (2011) ("[A] bidder may not stay silent about a flaw in a solicitation in the hopes either of winning a contract or, alternatively, protesting the content of the solicitation ... in the event it fails to receive an award."). As such, plaintiff has waived this argument.

Plaintiff submits that, even if this argument is untimely, the Court should consider the merits of plaintiff's argument pursuant to the "significant issue exception." Pl.'s Mot. for J. on AR 25–26. GAO recognizes such an exception to its waiver rule when "good cause for the untimely filing" is evidenced or when "the protest presents a significant issue (one of widespread interest to the procurement community that has not been considered before)." *Pardee Constr. Co.*, B– 256414, 1994 WL 269819, at *4 (Comp.Gen. June 13, 1994). Plaintiff argues that the latter exception applies here, stating that "it is unclear how

Congress intended the Veterans First Program contracting preferences to apply." Pl.'s Mot. for J. on AR 26. Plaintiff's argument is unpersuasive. The Court finds that the issue in question is not one of such "widespread interest" as to warrant making an exception to the important and efficient waiver rule as adopted by the Federal Circuit. If the issue was of such grave concern, plaintiff had all the more reason to raise it during the bidding process.

*E. DVA Performed a Reasonable Evaluation of the Offerors' Past Performance*

■ Plaintiff next argues that DVA improperly evaluated the past performance factor for all offerors in the competitive range. *See* Pl.'s Mot. for J. on AR 27–28. In so contending, plaintiff reasons that "[t]he fact that *all* offerors in the competitive range received a 'Low Risk' Rating ... is questionable and raises concern that Past Performance was not properly evaluated." *Id.* at 27. Plaintiff then notes that there were "wide discrepancies in both the number of responses received for each offeror and the ratios of 'Exceptional' versus 'Satisfactory' responses." *Id.* Plaintiff alleges that the "low risk" rating was rendered meaningless because it was assigned to a variety of offerors despite divergent responses. *Id.* at 28.

The record indicates that DVA evaluated each offeror's past performance and, as plaintiff points out, awarded a "low risk" rating to all offerors in the competitive range. AR Tab 279, at 82976–83017. Notably, none of the offerors received unsatisfactory responses. *Id.* In fact, all of the offerors were awarded some combination of exceptional and satisfactory responses. *Id.* According to the SSEB briefing, a rating of "low risk" was awarded when "[l]ittle doubt exist[ed], based on the offeror's performance record, that the offeror c[ould] perform the proposed effort." AR Tab 279, at 82975. The next rating, "moderate risk," was assessed when "[s]ome doubt exist[ed]," and the final rating, "high risk," was assessed when "[s]ignificant doubt exist[ed]." *Id.* These are fairly broad, somewhat vague definitions, and the Solicitation provided no

way of ranking a "low risk" offeror against a lower risk offeror, for example. *Cf. Fort Carson Support Servs. v. United States,* 71 Fed.Cl. 571, 589 (2006) (explaining, in the context of making a final decision regarding award, the option of using a separate ranking system, such as the plus/minus system used in education, to distinguish offerors that receive the same adjectival rating for a certain factor or criterion). Here, an additional, more nuanced system of rankings was not contemplated by the Solicitation, and whether to utilize such a system is a decision for DVA. Accordingly, because the broad rating of "low risk" reasonably encompasses a range of offerors, the Court cannot conclude that DVA conducted an improper evaluation of the past performance factor.

### F. DVA Held Meaningful and Equitable Discussions Regarding Plaintiff's Proposals

#### 1. DVA Held Proper Discussions Regarding Plaintiff's Price Proposal

Plaintiff next argues that DVA did not conduct meaningful discussions because it failed to address the fact that plaintiff's price proposal was too high, one of DVA's rationales for not awarding plaintiff a contract. Pl.'s Mot. for J. on AR 30–32.

Under FAR Part 15, when conducting discussions "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."[6] FAR 15.306(d)(3). Consistent with this obligation, FAR states that the contracting officer "is not required to discuss every area where the proposal could be improved" and explains that the contracting officer has considerable discretion regarding the contents of discussions. *Id.; see Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999) ("The contracting officer has

broad discretion in conducting discussions."), *aff'd,* 216 F.3d 1054 (Fed.Cir.2000).

For discussions to be meaningful, they must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *Banknote Corp. of Am., Inc. v. United States,* 56 Fed.Cl. 377, 384 (2003) (quoting *WorldTravelService v. United States,* 49 Fed.Cl. 431, 439 (2001)), *aff'd,* 365 F.3d 1345 (Fed.Cir.2004). Although discussions must be specific, the procuring agency is not required "to address in express detail all inferior or inadequate aspects of a proposal." *Id.* at 385 (quoting *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 835 (1999)) (internal quotation marks omitted); *see also WorldTravelService,* 49 Fed.Cl. at 439–40 (noting that meaningfulness "does not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal" (quoting *LaBarge Elecs.,* B– 266210, 1996 WL 53930, at *5 (Comp.Gen. Feb. 9, 1966))) (internal quotation marks omitted).

Here, as required by FAR 15.306(d)(3), defendant conducted discussions with each of the twenty-two offerors included in the initial competitive range. *See* AR Tabs 136–57. In doing so, it submitted seven IFNs to plaintiff identifying concerns with plaintiff's proposal and requesting plaintiff's response. *See* AR Tab 154. In accordance with FAR, the IFNs explicitly identified weaknesses in plaintiff's proposal. *Id.; see* FAR 15.306(d)(3). One IFN stated that, after review of the plaintiff's price proposal, the contracting officer determined that plaintiff's "price may not be fair and reasonable." AR Tab 154, at 41957.

Although the IFN did not specifically state that plaintiff's price proposal might be too high, the IFN directed plaintiff to concerns about the fairness and reasonableness of its price proposal, and that was enough to "lead" plaintiff to the area of its proposal encompassing that issue. *See Banknote Corp. of*

---

**6.** Additionally, FAR "encourage[s]" contracting officers to include in their discussions other aspects of a proposal at issue that could, if amend-

ed or explained, increase the likelihood that the proposal will result in an award. FAR 15.306(d)(3).

*Am., Inc.,* 56 Fed.Cl. at 384. The contracting officer was under no obligation to specifically notify plaintiff that its price proposal might be too high and could result in its failure to receive an award. *See id.; see also Structural Assocs., Inc. v. United States,* 89 Fed.Cl. 735, 743 (2009) ("[D]iscussions ... are designed to point out shortcomings in an offeror's proposal as judged from the standpoint of the government's stated needs, rather than from the standpoint of the proposal's relative competitiveness."). By apprising plaintiff of weaknesses in its proposal, the contracting officer properly used her discretion and fulfilled her obligations under FAR. *See* FAR 15.306(d)(3). Therefore, DVA's discussions with plaintiff were meaningful and complied with the requirements of FAR. *See PHT Supply Corp. v. United States,* 71 Fed.Cl. 1, 21–22 (2006) (explaining that compliance with FAR's provisions constitutes a meaningful discussion).

In addition to arguing that DVA's discussions were not meaningful, plaintiff contends that the discussions were inequitable. Pl.'s Mot. for J. on AR 30–32. Specifically, plaintiff argues that because other offerors "were informed through discussions that their labor rates were unrealistically low," it was inequitable that DVA did not apprise plaintiff that its price may be too high. *Id.* at 32. Had DVA undertaken such discussions, plaintiff maintains that it would have lowered its price and, therefore, would have had a substantial chance of receiving an award. *Id.*

 Under FAR Part 15, the Government "shall not engage in conduct that ... [f]avors one offeror over another." FAR 15.306(e)(1). Thus, discussions between the Government and each of the offerors must be equal. *AshBritt, Inc. v. United States,* 87 Fed.Cl. 344, 372 (2009) (noting, for example, that "[t]he Government may not inform some offerors of a concern with their pricing level while staying silent with respect to identical issues in other offerors' proposals"). An "advantageous piece of information" may not be disclosed to only some offerors being considered for an award. *Kerr Contractors, Inc. v. United States,* 89 Fed.Cl. 312, 329 (2009). However, "agencies are not required to conduct identical discussions with each offeror."

*Femme Comp Inc. v. United States,* 83 Fed. Cl. 704, 735 (2008) (citing *WorldTravelService,* 49 Fed.Cl. at 440). Instead, discussions are to be conducted in a manner that addresses the specifics of each individual offeror's proposal. *WorldTravelService,* 49 Fed. Cl. at 440.

Here, as plaintiff notes, certain offerors were told during the discussion phase that their proposed labor rates were unrealistically low. Unrealistically low labor rates, which were assessed pursuant to the management sub-factor of the technical factor, AR Tab 3, at 252, is an issue distinct from a high-priced proposal, an entirely different evaluative factor. *See* AR Tab 3, at 254. Additionally, DVA indicated to plaintiff that its price proposal was a cause for concern in an IFN issued during the discussion phase, thus "leading" it to the area of its proposal that later contributed to its not receiving an award. *See Banknote Corp. of Am., Inc.,* 56 Fed.Cl. at 384. DVA apprised plaintiff of this despite the fact that the contracting officer was not required to tell plaintiff that its price might be too high or that it was higher than other offerors. *See DMS All-Star Joint Venture v. United States,* 90 Fed. Cl. 653, 669 (2010) (noting that price does not have to be raised during discussions if it could be acceptable and that, "unless an offeror's costs constitute a significant weakness or deficiency in its proposal, the contracting officer is not required to address in discussions costs that appear to be higher than those proposed by other offerors"). Therefore, DVA properly conducted discussions with each offeror, tailoring the IFNs to the relevant weaknesses and deficiencies of the individual proposals. Accordingly, with regard to plaintiff's price proposal, the Court finds that DVA conducted meaningful and equitable discussions in accordance with FAR.

### 2. DVA Held Proper Discussions Regarding Plaintiff's SBPC Proposal

 Plaintiff alleges that DVA failed to hold discussions with plaintiff regarding its SBPC proposal and that such failure was a violation of FAR. Pl.'s Mot. for J. on AR 34–36. Specifically, plaintiff contends that

DVA's assessment of plaintiff's SBPC proposal as presenting a "moderate to high degree of risk to [plaintiff's] ability to meet the goals" of the Solicitation is tantamount to a finding of "significant weakness." *Id.* at 35. Such a finding would trigger the FAR requirement to conduct a discussion with the offeror concerning that weakness. *Id.; see also* FAR 15.306(d)(3). Accordingly, plaintiff's argument can be broken down into two parts: (1) that DVA failed to label its concern with plaintiff's SBPC proposal as a "significant weakness," and (2) that, because this concern should have been labeled as a "significant weakness," DVA failed to conduct the discussions mandated by FAR.

As discussed, according to FAR, "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). FAR defines significant weakness as "a flaw that appreciably increases the risk of unsuccessful contract performance." FAR 15.001.

Here, DVA awarded plaintiff an "acceptable" rating for its SBPC proposal, meaning that its proposal "demonstrate[d] a minimal commitment to small business participation, contain[ed] minimal detail, and [was] at least minimally feasible." AR Tab 284, at 83229–31. Under its assessment of risk, DVA found that plaintiff's proposal represented a "moderate" risk of meeting the goals of the Solicitation. *Id.* In awarding this rating, DVA analyzed plaintiff's proposal as having one significant strength, four strengths, and no weaknesses, significant weaknesses, or deficiencies. AR Tab 284, at 83231.

Plaintiff essentially argues that DVA should have awarded plaintiff a significant weakness for the SBPC factor. However, although plaintiff's SBPC proposal was found to present a moderate risk, there is nothing to indicate that plaintiff's SBPC proposal contained "a flaw that appreciably increase[d] the risk of unsuccessful contract performance." FAR 15.001. Risk of unsuccessful contract performance is different from an assessment that a proposal presents

some risk that it may not meet the percentage goals for SBPC participation.

 Furthermore, in assessing acceptability, the contracting officer has a wide range of discretion. *See DynCorp Int'l LLC,* 76 Fed.Cl. at 537. The contracting officer is obligated to execute the duties described in FAR, which in essence provides that a "contracting officer must address those elements of a proposal that suggest an offeror's misunderstanding of a solicitation's requirements." *Structural Assocs., Inc.,* 89 Fed.Cl. at 743. There is nothing in the record to indicate that the contracting officer erred when she assessed plaintiff's SBPC proposal as "acceptable" when it received only strengths and significant strengths, and there is nothing to suggest that plaintiff so misunderstood the solicitation's requirements as to mandate discussions. Accordingly, plaintiff has not demonstrated that DVA violated FAR by not engaging in discussions with plaintiff regarding its SBPC proposal.

### G. DVA Properly Rated Plaintiff's SBPC Proposal as "Acceptable"

 Plaintiff takes issue with the fact that it was only awarded a rating of "acceptable" with regard to its SBPC proposal despite having a number of strengths and no weaknesses. In awarding this rating, DVA found that the proposal provided a minimal level of detail, was minimally feasible, presented a moderate to high degree of risk, and demonstrated a minimal commitment to small business participation. AR Tab 284, at 83229–31.

First, agencies have wide discretion when assigning ratings to certain aspects of proposals. *See DynCorp Int'l LLC,* 76 Fed.Cl. at 537. Given the definition of "acceptable" and the various strengths that plaintiff was awarded, nothing indicates that DVA abused its discretion in assigning an "acceptable" rating to plaintiff's proposal. Second, DVA awarded this rating to other offerors that possessed strengths and no weaknesses for this factor, illustrating that DVA did not act arbitrarily or capriciously in its evaluation of plaintiff's SBPC proposal. *See, e.g.,* AR Tab 279, at 83037–38, 83043–44, 83055–56, 83059–60. Moreover, plaintiff's disagreement with

its rating is itself insufficient from a legal point of view. *See Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 329 (2000) ("[A] mere disagreement with the agency's evaluation ... alone is not sufficient to establish that the [agency's] evaluation was unreasonable or arbitrary and capricious...."). Accordingly, plaintiff's claim is unpersuasive.

## III. Relief

In its amended complaint, plaintiff requests that the Court (1) enjoin DVA from continuing with performance on the T4 contract, or, in the alternative, at least enjoin performance of the contracts awarded in step two; (2) cancel either all awards or all awards made in step two, and award a contract to plaintiff; and (3) if the first two requests are denied, instruct DVA to request revised proposals, to engage in an evaluation of those proposals, and to make new awards based on the revised proposals. Am. Compl. 15–16.

### A. Plaintiff Was Prejudiced by DVA's Failure to Adequately Document and Explain Two Best–Value Tradeoff Analyses Involving Plaintiff

 When a protester alleges that an agency violated a law or regulation, it "must show 'a clear and prejudicial violation of applicable statutes or regulations.' " *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1333 (Fed.Cir. 2001) (quoting *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)). Prejudice is established when the protester shows "that there was a substantial chance it would have received the contract award but for that error." *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed.Cir. 2004) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)) (internal quotation marks omitted). Specifically, "in the context of a violation of FAR 15.308[, this standard] requires that the protestor's chances of receiving the contract be increased, if the SSA complied with FAR." *Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 121 (2006). Here, the SSA did not adequately document or explain her reasoning for finding that plaintiff's proposal did not

represent the best value to the Government. Given the small number of offerors, the Court finds that a more thoroughly reasoned and documented best-value tradeoff analysis would have created a substantial chance that plaintiff would have received an award. *See Galen Med. Assocs., Inc.,* 369 F.3d at 1331. Accordingly, plaintiff suffered prejudice as a result of defendant's conduct. *Cf. Femme Comp Inc.,* 83 Fed.Cl. at 771 (finding that offerors were prejudiced when there were "improper evaluations and best value tradeoffs").

Additionally, when DVA conducted its best value analysis of plaintiff's and offeror 37's (FirstView Federal TS) proposals after offeror 20 ( [* * *] ) was eliminated as an awardee, if offeror 37 (FirstView Federal TS) had not been awarded a contract, plaintiff necessarily would have been. This is so because plaintiff and offeror 37 (FirstView Federal TS) were the only remaining SDVOSB/VOSB concerns in the competitive range after offeror 20 ( [* * *] ) was eliminated. After offeror 20's ( [* * *] ) elimination, DVA had one contract left to award to an SDVOSB/VOSB concern in order to comply with its Solicitation. That award, therefore, had to go to either offeror 37 (FirstView Federal TS) or to plaintiff. If it had been determined that offeror 37 (FirstView Federal TS) did not represent the best-value to the Government, plaintiff would have received the award. Therefore, plaintiff was prejudiced when the SSA failed to conduct a legally sufficient best-value tradeoff analysis. *See Wackenhut Servs., Inc. v. United States,* 85 Fed.Cl. 273, 310 (2008) ("[B]ecause [the plaintiff] was the only other bidder determined to be in the competitive range, but for the award to [the other offeror, plaintiff] likely would have been awarded the contract.").

### B. Plaintiff Is Entitled to Tailored Injunctive Relief

When determining whether to issue an injunction, a court considers the following factors:

(1) whether ... the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3)

whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004).

### 1. *Plaintiff Succeeded on the Merits*

 As discussed above, plaintiff succeeded on the merits of its claim that DVA's best-value tradeoff analyses as to plaintiff and offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation) and as to plaintiff and offeror 37 (FirstView Federal TS) were not adequately documented or explained in compliance with FAR 15.308. *See supra* Part II. B.2–3.

### 2. *Plaintiff Will Suffer Irreparable Harm if the Court Withholds Equitable Relief*

The second factor to be considered in connection with an injunction is that, absent such relief, plaintiff will suffer irreparable harm. *PGBA, LLC,* 389 F.3d at 1229. First, the Court must find that plaintiff does not have an adequate remedy at law absent an injunction. *Beard v. United States,* 99 Fed.Cl. 147, 159 (2011). Plaintiff argues that the injury of being deprived of a contracting opportunity has no adequate remedy at law. In that regard, recovery of bid and proposal preparation costs are not adequate compensation for loss of an award under the Solicitation. *See Heritage of Am., LLC v. United States,* 77 Fed.Cl. 66, 78 (2007) ("Where ... plaintiff has no action against the United States for lost profits, the harm to plaintiff is irreparable and that harm satisfies the second criterion for injunctive relief"). Second, plaintiff argues that "the potential loss of a valuable contract is sufficient to show irreparable harm." Pl.'s Mot. for J. on AR 37 (citing *Transatlantic Lines, LLC v. United States,* 68 Fed.Cl. 48, 57 (2005)). Another case explains that the potential loss of "valuable business on a contract" "deriv[es] from a lost opportunity to compete in a fair competitive bidding process for a contract." *Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 744 (2000). Here, the Court has found that DVA did not engage in two best-value tradeoff analyses consistent with FAR, and, as a result, plaintiff lost the opportunity to compete in a fair procurement process. That is sufficient to constitute irreparable harm. *See Heritage of Am., LLC,* 77 Fed.Cl. at 78 ("[T]he failure of an offeror to have its proposal 'fairly and lawfully considered constitutes irreparable injury.' " (quoting *Great Lakes Dredge & Dock Co. v. United States,* 60 Fed.Cl. 350, 370 (2004))); *Mangi Envtl. Grp., Inc. v. United States,* 47 Fed.Cl. 10, 20 (2000); *Overstreet Elec. Co., Inc.,* 47 Fed.Cl. at 744.

Additionally, this court has found irreparable harm when "[o]fferors in the competitive range ... lost the opportunity to perform under the contract ... due to the [agency's] failure to properly evaluate their proposals and perform the best value tradeoffs." *Femme Comp Inc.,* 83 Fed.Cl. at 771–72. Accordingly, plaintiff has shown that without an injunction it will suffer irreparable harm.

### 3. *The Balance of Hardships Favors Tailored Injunctive Relief*

To warrant issuing an injunction, the Court must find that balancing the hardships to plaintiff and defendant weighs in favor of affording relief to plaintiff. *PGBA, LLC,* 389 F.3d at 1229. Here, DVA argues that the balance of hardships tips in its favor because an injunction will render it unable to obtain IT services in support of DVA's mission. Plaintiff argues that DVA would not be significantly harmed by an injunction because it could readily obtain the needed IT services as it has done in the past while the agency performs proper best-value tradeoffs. In fact, the award of injunctive relief tailored as set forth below would at most affect four contracts—those awarded to offerors 3 (Adams), 9 (By light Professional IT Services, Inc.), 95 (Technatomy Corporation), and 37 (FirstView Federal TS) as a result of inadequate best-value tradeoff analyses—while DVA performs new best-value tradeoff analyses in compliance with FAR.

### 4. *The Public Interest Favors Tailored Injunctive Relief*

With regard to the fourth part of the injunction analysis, case law explains "that the public interest in protecting the integrity

of the procurement system is well served by granting injunctive relief." *T & S Prods., Inc. v. United States,* 48 Fed.Cl. 100, 113 (2000). Additionally, ensuring that the Government follows applicable procurement regulations also promotes the public interest. *Id.* DVA contends that plaintiff "failed to show that the integrity of the procurement system has been compromised" and, without such, it "cannot show that the public interest is served by injunctive or declaratory relief." Def.'s Cross–Mot. for J. upon AR 29. On the contrary, plaintiff has shown that DVA failed to follow the requirements of FAR when conducting two best-value tradeoff analyses involving plaintiff. Accordingly, it would be in the public interest to order tailored injunctive relief in favor of plaintiff while DVA comes into compliance with FAR.

In devising tailored injunctive relief, the Court has attempted to take into account the legitimate interests of plaintiff, DVA, the awardees (including the three intervenors in this action), and national defense and national security. *See Parcel 49C Ltd. P'ship v. United States,* 31 F.3d 1147, 1153 (Fed.Cir. 1994) (noting that the Federal Circuit "has reiterated that equitable powers 'should be exercised in a way which best limits judicial interference in contract procurement.'" (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983))).

## CONCLUSION

In view of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion for judgment on the administrative record, **GRANTS IN PART** and **DENIES IN PART** defendant's and defendant-intervenor HP's motions for judgment on the administrative record, and **DENIES** defendant's motion to dismiss as moot.

Additionally, because plaintiff was prejudiced by DVA's failure to follow applicable regulations in documenting and explaining two best-value tradeoff analyses involving plaintiff and certain of the step-two awardees identified in paragraphs 1 and 2 below, and because the Court has concluded that, in light of the Court's four-factor analysis, plaintiff is entitled to tailored injunctive relief

as a result of DVA's conduct, the Court hereby **ORDERS:**

1. DVA shall conduct a new best-value tradeoff analysis of plaintiff's proposal and the proposals of offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation); this new analysis shall comply with FAR and its conclusion and rationale shall be thoroughly documented and explained;

2. If DVA does not award plaintiff a contract after it conducts a new best-value tradeoff analysis with respect to offerors 3 (Adams), 9 (By Light Professional IT Services, Inc.), and 95 (Technatomy Corporation), then DVA shall conduct a separate, new best-value tradeoff analysis of plaintiff's proposal and offeror 37's (FirstView Federal TS) proposal; this new analysis shall comply with FAR and its conclusion and rationale shall be thoroughly documented and explained; and

3. If, after completion of either of the new best-value tradeoff analyses described in paragraphs 1 and 2 above, plaintiff's proposal is found to represent the best value to the Government, DVA shall not make an award to any entity other than plaintiff provided DVA finds plaintiff to be a responsible offeror. *See Great Lakes Dredge & Dock Co.,* 60 Fed.Cl. at 370–71 (2004). DVA shall also terminate the contract of any current step-two awardee that is determined to no longer represent the best-value to the Government.

Some information contained herein may be considered protected information subject to the protective order entered in this action on August 31, 2011 (docket entry 23). This Opinion and Order shall therefore be filed under seal. The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication. The Court **FURTHER ORDERS** that the parties shall file, by **Monday, November 21, 2011,** a joint status report identifying the information, if

any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**